T.C. Memo. 2012-16

UNITED STATES TAX COURT

SCOTT A. AND AUDREY R. BLUM, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2679-06.                    Filed January 17, 2012.


Ps, through a grantor trust, entered into an
Offshore Portfolio Investment Strategy (OPIS)
transaction through KPMG, an accounting firm.  Through
direct and indirect interests in UBS stock, they
created a $45 million loss.  Ps claimed the loss for
tax purposes but did not, in fact or substance, incur a
$45 million loss.  Ps were pursued by KPMG when KPMG
became aware that Ps would have a substantial capital
gain.  KPMG issued an opinion, after the fact, that the
$45 million capital loss would "more likely than not"
be upheld.

1.  Held: the OPIS transaction is disregarded
under the economic substance doctrine.

2.  Held, further, Ps are liable for accuracy-
related penalties for gross valuation misstatements and
negligence under sec. 6662(a), I.R.C.

Nancy Louise Iredale, Jeffrey Gabriel Varga, and Stephen J. Turanchik, for petitioners.

Henry C. Bonney, Jr., Kevin G. Croke, and Elizabeth S. Martini, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  Respondent determined deficiencies in and penalties with respect to petitioners' Federal income taxes for 1998, 1999 and 2002 (years at issue) as follows:

| | | Penalties | |
| Year | Deficiency | Sec. 6662(b) | Sec. 6662(h) |
| 1998 | $9,414,861 | $1,948 | $3,762,048 |
| 1999 | 16,298,672 | 2,954 | 6,513,560 |
| 2002 | 18,737 | 3,747 | -0- |

The parties have resolved a number of issues in their stipulation of settled issues.  In addition, the Court dismissed for lack of jurisdiction those portions of the deficiencies and penalties pertaining to petitioners' Bond Leveraged Investment Portfolio Strategy (BLIPS) transaction.  Accordingly, the parties will need to prepare a Rule 155[1] computation.

This Court has not previously considered an Offshore Portfolio Investment Strategy (OPIS) transaction.  The question

_____

[1]All section references are to the Internal Revenue Code (Code) for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  All monetary amounts are rounded to the nearest dollar.

before us is whether petitioners are entitled to deduct certain capital losses claimed from their participation in the OPIS transaction. We hold that they are not because the transaction lacks economic substance. We must also decide whether petitioners are liable for gross valuation misstatement penalties and negligence penalties under section 6662(a). We hold they are liable for the penalties.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts and documents, the second stipulation of facts and documents, the third stipulation of documents and the accompanying exhibits by this reference. Petitioners resided in Jackson, Wyoming when they filed the petition.

## I. Petitioners' Background

Scott Blum (Mr. Blum) and Audrey Blum (Mrs. Blum) were married in the mid-1990s and have twin children. Mr. Blum, the only adopted child of an engineer and a secretary, was an entrepreneurial child and prone to selling his toys. After parking cars for a hotel and selling women's shoes, he started his first company when he was 19 years old to sell computer memory products. He sold that company two years later for over $2 million. During the same year, at the age of 21, Mr. Blum started Pinnacle Micro, Inc. (Pinnacle) with his parents. Mr. Blum and his parents ran Pinnacle for nine years, including when

it was a public company. Mr. Blum entered into an Internet-based business after leaving Pinnacle.

Mr. Blum founded Buy.com, an online retailer, in 1997, and it set a record for being the fastest growing company in United States history during its first year of operation. In 1998 Mr. Blum sold a minority interest in Buy.com stock for a total of $45 million. The sales comprised a $5 million stock sale in August and a $40 million stock sale at the end of September. His basis in the stock was zero, and in response to the potential gain Mr. Blum entered into a $45 million OPIS transaction during 1998, creating a capital loss of approximately $45 million. The OPIS transaction was created, managed and promoted by Mr. Blum's accounting firm.

Mr. Blum, a savvy businessman, has relied on advisers including accountants, attorneys and investment counselors. He never prepared his own tax return. We will introduce the participants in the OPIS transaction and the entities used to set up the transaction before describing the arrangement.

II. The Participants

A. The Blum Trust

Mr. Blum created the Scott A. Blum Separate Property Trust (Blum Trust) in 1995 as a grantor trust. A grantor trust is disregarded as an entity for Federal income tax purposes. The Blum Trust was established near the time of Mr. Blum's marriage

for family financial planning purposes to address the possibility of a divorce and its effect upon his corporate businesses. The Blum Trust normally held stock in Mr. Blum's start-up companies and has held other investments through stock brokerage firms.

B. KPMG

Petitioners' accountant, KPMG Peat Marwick LLP (KPMG),[2] a "Big Four" tax and accounting firm, prepared their individual tax returns. KPMG also represented petitioners in a Federal income tax audit, and Mr. Blum hired KPMG employees to work for him as his business employees.

KPMG is a member firm of KPMG International, a Swiss cooperative, of which all KPMG firms worldwide are members. At all relevant times, KPMG was one of the largest accounting firms in the world, providing services to many of the largest corporations worldwide. KPMG provided tax services to corporate and individual clients, including preparing tax returns, providing tax planning and tax advice and representing clients before the Internal Revenue Service and the U.S. Tax Court.

In 1998 KPMG was promoting a transaction commonly referred to as OPIS. KPMG's capital transaction group sought clients with large capital gains (above a certain dollar threshold) for the OPIS transaction. Brent Law (Mr. Law) referred petitioners to

---

[2]The firm's name was later reduced by removing "Peat Marwick."

KPMG's capital transaction group. Mr. Law had represented petitioners in their audit and had prepared their tax returns. Mr. Law knew that Mr. Blum had potential capital gains from sales of Buy.com stock. He therefore suggested to Mr. Blum's financial adviser (Mr. Williams) that they contact KPMG's capital transaction group to structure Mr. Blum's stock sales. Days later, Mr. Blum or Mr. Williams contacted Mr. Law and asked to be introduced to Carl Hasting (Mr. Hasting) of KPMG's capital transaction group.

Mr. Hasting explained the OPIS transaction to Mr. Blum without providing any written materials. Despite the magnitude of the investment, Mr. Blum did not personally perform an economic analysis of the transaction or consult with his investment advisers about the transaction. He simply inquired into KPMG's reputation. On the basis of two hour-long meetings with Mr. Hasting and without a written prospectus or other documentation, Mr. Blum decided to participate in the OPIS transaction.

Mr. Blum, on his own behalf and on behalf of the Blum Trust, signed an engagement letter in September 1998 (KPMG engagement letter). Mr. Blum signed the KPMG engagement letter only four days before he signed a stock purchase agreement to sell $40 million of Buy.com shares. Pursuant to the KPMG engagement letter, Mr. Blum and the Blum Trust retained KPMG to provide

advice on the OPIS transaction. KPMG agreed to provide a tax opinion letter to Mr. Blum for the OPIS transaction, but only if requested. Upon such request, the opinion letter would rely on "appropriate" facts and representations, and state that the tax treatment described in the opinion would "more likely than not" be upheld. KPMG specified, in the KPMG engagement letter, that its fees were based on the complexity of its role and the value of the services provided, rather than time spent. KPMG's minimum fee was to be $687,500, with an additional amount to be agreed on by the parties.

Except for a call from Mr. Hasting to Mr. Blum about a month into the OPIS transaction, Mr. Blum did not track or monitor the transaction. He was generally unfamiliar with the entities involved in his OPIS transaction, other than KPMG and UBS AG (UBS), and lacked even a generalized knowledge about the assets involved in the deal.

C. Foreign Special Purpose Entities

Three foreign entities were formed to implement Mr. Blum's OPIS transaction, although he was not familiar with them. Alfaside Limited (Alfaside) was incorporated in the Isle of Mann on September 28, 1998. Four days later, Benzinger GP, Inc. (Benzinger GP) was incorporated as a Cayman Islands exempted

company.[3]  The following day, Alfaside acquired 100-percent

ownership of Benzinger GP and formed a Cayman Islands limited

partnership with Benzinger GP called Benzinger Investors, L.P.

(Benzinger LP).[4]  Petitioners and KPMG intended that Benzinger GP

and Benzinger LP would both be corporations for U.S. Federal

income tax purposes.[5]  The following diagram illustrates the

ownership structure of the three foreign entities:

---

[3]A Cayman Islands exempted company is a common choice for
U.S. practitioners creating a foreign entity.  An exempted
company's operation is conducted mainly outside the Cayman
Islands.  A 20-year exemption from taxation in the Cayman Islands
is typically applied for.

[4]Benzinger LP filed a Form SS-4, Application for Employer
Identification Number.  It received a notification of its U.S.
Federal tax identification number on Dec. 22, 1998.

[5]Petitioners and KPMG took the position that Benzinger GP
defaulted to corporate treatment but also filed a protective
check-the-box election on Form 8832, Entity Classification
Election, electing corporate treatment.  See sec.
301.7701-3(b)(2), (c)(1)(i), Proced. & Admin. Regs.  Benzinger LP
did not default to corporate treatment, but petitioners and KPMG
took the position that it was eligible to elect its
classification and also filed a Form 8832 electing corporate
treatment for Benzinger LP.  See sec. 301.7701-3(a), (b)(2),
(c)(1)(i), Proced. & Admin. Regs.



D. QA Investments

A few days later, the Blum Trust retained QA Investments, LLC (QA) to serve as its investment adviser for the OPIS transaction.[6] Mr. Blum was not familiar with QA and had never spoken with anyone at QA when his grantor trust retained QA's services. Nevertheless, the investment advisory agreement (Blum Trust advisory agreement) between the Blum Trust and QA gave QA substantial discretionary authority with respect to specified funds owned by the Blum Trust, subject to the investment objectives. The Blum Trust's investment objectives specified an

---

[6]Quadra Capital Management, L.P., d.b.a. QA Investments, was a financial boutique providing asset management, financial advice, brokerage activities and tax planning services.

intent to acquire approximately $2,250,000 of UBS common stock and the right to instruct QA to purchase or sell put or call options on UBS common stock. The stated investment objectives also included an International Swaps and Derivatives Association (ISDA) swap agreement with respect to UBS and a privately negotiated call option related to the UBS stock price.[7] The Blum Trust agreed to pay QA a $135,000 fee within 30 days of the execution of the Blum Trust advisory agreement. The Blum Trust paid the fee in October 1998.

Benzinger LP also retained QA to serve as its investment adviser regarding the OPIS transaction pursuant to an investment advisory agreement (Benzinger LP advisory agreement). The Benzinger LP advisory agreement gave QA certain discretionary authority to implement an investment strategy based on certain expectations about UBS stock. The initial account value to be invested was $3,015,000 and the strategy contemplated a $45 million notional account value.[8] QA was to hedge the notional

---

[7]ISDA is a trade organization of participants in the market for over-the-counter derivatives. ISDA has created a standardized contract, the ISDA master agreement, which functions as an umbrella agreement and governs all swaps between the parties to the ISDA master agreement. See generally K3C Inc. v. Bank of Am., N.A., 204 Fed. Appx. 455, 459 (5th Cir. 2006).

[8]In this context, notional account value refers to the total value of a leveraged position. The investment strategy was to be initiated through the purchase of UBS securities with a $45 million market value by securing financing or leverage through a variety of possible means including borrowing, margin,

(continued...)

account value by writing in-the-money covered call options or purchasing long significantly out-of-the-money put options.[9]  QA billed Benzinger LP $562,500, calculated as a percentage of the notional account value, in December 1998.

E. UBS

Union Bank of Switzerland merged with Swiss Bank Corporation (SBC) in mid-1998, a year at issue, to form the entity now known as UBS.  QA first introduced UBS' Global Equity Derivatives group to the OPIS transaction.  KPMG subsequently provided additional information about the transaction to UBS.  A UBS officer estimated that UBS' profit for each OPIS transaction would be 2.5 percent to 3 percent of the notional amount of the transaction.

The price of UBS stock rose over 48 percent during the course of petitioners' OPIS transaction.

_____

[8](...continued)
derivatives and other investment techniques.

[9]Options are often referred to as being "at-the-money," "in-the-money," or "out-of-the-money."  An option that is "at-the-money" has its strike price equal to the market price of the underlying asset.  An option is "in-the-money" when the option's strike price is less than the current market price of the underlying asset.  If the value of the underlying asset is greater than the exercise price for a call option or less than the exercise price for a put option, that option is said to be "in-the-money."  In this case, it is advantageous to the owner of the option to exercise his or her right under the option as opposed to acquiring or selling such assets in the stock market.  An option is "out-of-the-money" when it would be disadvantageous to exercise the option, as opposed to acquiring or selling the assets in the stock market.

III. <u>The Transaction</u>

Having introduced the participants, we now delve into the operation of petitioners' OPIS transaction. We explain the different transactions and steps that make up the larger whole.

A. <u>Step 1: The Blum Trust Purchases UBS Stock and GP Call Option; Enters into Equity Swap</u>

Mr. Blum wired $2,250,000 to the Blum Trust's Pali Capital LLC (Pali) brokerage account (Pali account) on October 2, 1998, as contemplated in the Blum Trust advisory agreement. The same day, the Blum Trust used nearly all of those funds to purchase 10,469 shares of UBS stock.

Mr. Blum also wired $3,015,000 to SBC as payment from the Blum Trust to Alfaside for (1) the first two fixed payments under an equity swap agreement (equity swap) and (2) the premium under a call option (GP call option). The equity swap was an agreement between the Blum Trust and Alfaside. Under the equity swap, the Blum Trust would pay Alfaside two fixed payments on specified payment dates. After the termination date, Alfaside was to pay the Blum Trust an amount in Swiss francs (CHF) to be calculated based on the price of UBS common stock as of that date. Petitioners and KPMG theorized that the parties were not required to withhold U.S. tax under the equity swap.[10]

---

[10]KPMG opined that the equity swap would most appropriately be characterized for tax purposes as a notional principal contract. If that were the case, payments would be sourced by
(continued...)

The Blum Trust purchased the GP call option from Alfaside for $112,500. Pursuant to the GP call option, the Blum Trust could require Alfaside to either (1) sell its half of the stock of Benzinger GP for $229,500 or (2) pay a cash settlement price calculated from Benzinger GP's net asset value. The Blum Trust had a period of less than two months in which it could exercise its option.

B. Step 2:  Benzinger LP Purchases UBS Stock; Constructs Collar

In the second step, Benzinger LP entered into a delayed settlement agreement with UBS on October 16, 1998 to purchase 163,980 shares of UBS stock for $45 million. Benzinger LP treated the transaction for tax purposes as a stock purchase as of that date. It was, however, not required to pay for the stock and UBS was not required to deliver the stock until November 27, 1998. Benzinger LP's purported $45 million basis in the 163,980 shares would allegedly shift to the Blum Trust and therefore to petitioners on November 27 under step 3 below.

Also on October 16, Benzinger LP and UBS used put and call options to construct a collar on the 163,980 UBS shares.[11]

_____

[10](...continued)
the residence of the taxpayer and therefore exempt from withholding. See sec. 1441; sec. 1.863-7(b), Income Tax Regs.

[11]A collar is an option strategy that limits the possible positive or negative returns on an underlying investment to a specific range. Generally, in an option collar transaction, an

(continued...)

Benzinger LP purchased 163,980 put options[12] from UBS and sold 147,582[13] call options[14] to UBS. Pursuant to their terms, the options could be exercised only on their November 27, 1998 expiration date, and any options that were in-the-money on that expiration date would be automatically exercised.

The call options had a range option feature that required UBS to pay Benzinger LP certain amounts if the price of UBS stock achieved certain levels on specified days (RECAP feature). On the same day Benzinger LP and UBS entered into the options, however, the price of the UBS stock closed below the specified level. The stock's closing below the specified level eliminated or terminated the RECAP feature before any payments came due under it. The share price drop also reset the strike price on the call options to 90 percent, the same as the strike price on the put options.

The cost of the UBS call options was almost CHF 3 million more than the cost of the Benzinger LP put options. Benzinger LP

---

[11](...continued)
investor purchases a put option and sells a call option.

[12]In industry parlance, these put options are plain-vanilla 90-percent put options.

[13]These options represent 90 percent of the total number of options.

[14]In industry parlance and as partially described below, these call options could be considered 95-percent call options with barrier and reset and embedded range options.

was required to deposit that difference with UBS as part of the security for the stock purchase. The remainder of the security posted with UBS consisted of the $3,015,000 that the Blum Trust paid for the equity swap and the GP call option, converted into CHF.[15]

In sum, Benzinger LP purported to purchase $45 million worth of UBS stock on October 16, 1998, but paid no money, received no stock and entered into transactions that would cause it to never receive at least 90 percent of the stock.

QA subsequently sent UBS a document denominated "trade ticket" that ensured Benzinger LP would not receive the other 10 percent of the stock. The trade ticket ordered UBS to simultaneously redeem any UBS shares held by Benzinger LP on November 27, 1998 after the call or put options were exercised.

C. Step 3:  UBS Redeems the 163,980 Shares While the Blum Trust Purchases 163,980 Call Options

In the third step, UBS redeemed the 163,980 shares that Benzinger LP had acquired that day pursuant to the delayed settlement. This was primarily completed through automatic exercise of the call options, which were in-the-money on November 27, 1998.[16]

_____

[15]CHF 6,880,935 was deposited with UBS, composed of CHF 2,913,195 net amount from the put and call options and CHF 3,967,740 (exchanged from $3,015,000).

[16]The put options were out-of-the money on that date and
                                        (continued...)

Pursuant to the trade ticket, UBS redeemed the remaining 16,398 shares that were not included in the call options on the same day. The cumulative result of these transactions was as follows:

| Transaction | Information | CHF |
|---|---|---|
| Step 2 transactions (delayed settlement, collar) and UBS redemption | 163,980 shares | -4,622,760 |
| Deposit from the Blum Trust | $3,105,000 converted to CHF | 3,967,740 |
| Interest on collateral | | 6,984 |
| Net premium due Benzinger LP on collar | | 2,913,195 |
| Total | Due to Benzinger LP from UBS | 2,265,159 |

The total due from UBS to Benzinger LP, CHF 2,265,159, was converted to $1,660,065 and paid on December 8, 1998.

At the same time that UBS redeemed the 163,980 shares, the Blum Trust purportedly purchased 163,980 out-of-the-money call options on UBS stock (OTM call options). The OTM call options were 16.5 percent out-of-the-money. They cost $675,000 and expired a month later on December 28, 1998.

---

[16](...continued)
therefore expired worthless. See supra note 9 for an explanation of in-the-money and out-of-the-money options. See infra note 17 for an explanation of expiring worthless.

D. Step 4: Closing Out

Mr. Blum then closed out the OPIS transaction.  The Blum Trust's 163,980 call options were left to expire worthless on December 28, 1998.[17]  On the same day, the Blum Trust also sold 10,469 shares of UBS stock that had been purchased less than three months before.  In early January 1999 the Blum Trust purportedly received from Alfaside (1) $368,694 for cash settling the GP call option and (2) approximately $1.6 million pursuant to the equity swap.

E. The Net Result

At the conclusion of this convoluted and contrived series of transactions, the net cost of the OPIS transaction to Mr. Blum was approximately $1.5 million.  For that cost, the OPIS transaction yielded over $45 million in capital losses to offset capital gains on tax returns petitioners filed.  The following diagram depicts the cumulative transaction:

---

[17]Options have an exercise period or date(s) and an expiration date, and therefore generally lose value as time passes.  If an option expires out-of-the-money (below the exercise price for a call option and above the exercise price for a put option), then the option will be said to expire worthless.



IV. <u>Tax Returns</u>

KPMG prepared petitioners' tax returns, on which they claimed over $45 million in capital losses for 1998 from the OPIS transaction.  Mr. Blum reported these losses on the Blum Trust's tax return for 1998, the only tax return the Blum Trust has ever filed.  The Blum Trust's alleged losses were reported in a chart that included the following:

| Item | Date Acquired | Date Sold | Gross Sales Price | Cost or Other Basis | Gain / Loss |
|---|---|---|---|---|---|
| UBS stock | 10/2/98 | 12/28/98 | $3,257,593 | $39,681,917 | -$36,424,324 |
| UBS options | 11/27/98 | 12/27/98 | -0- | 8,629,508 | -8,829,509 |
| Buy.com | 7/30/97 | 10/20/98 | 500,000 | -0- | 500,000 |
| Buy.com | 7/30/97 | 10/29/98 | 20,000,000 | -0- | 20,000,000 |
| Buy.com | 7/30/97 | 10/30/98 | 20,000,000 | -0- | 20,000,000 |
| Buy.com | 7/30/97 | 8/17/98 | 5,000,000 | -0- | 5,000,000 |

The loss of over $36 million was reported on the Blum Trust's sale of the 10,469 shares of UBS stock purchased at step 1. The nearly $9 million loss was reported on the 163,860 call options purchased at step 3, which expired worthless. The capital gains from the sales of Buy.com shares were essentially eliminated by the losses claimed from the OPIS transaction. Petitioners reported this net difference, as adjusted by a few other unrelated sales, on the income tax return they filed for 1998. Petitioners also claimed a $1,754,670 capital loss from the equity swap on the income tax return they filed for 1999.

V. Tax Opinion

The KPMG engagement letter stated that KPMG would provide a tax opinion letter regarding the OPIS transaction, if requested. KPMG sent to Mr. Blum a letter, dated after petitioners filed an income tax return for 1998, asking Mr. Blum to represent certain information about the OPIS transaction. KPMG agreed to finalize and issue its tax opinion after receiving the signed

representation letter. Mr. Blum signed the representation letter in May 1999. In that letter, Mr. Blum represented that he had independently reviewed the economics underlying the investment strategy and believed it had a reasonable opportunity to earn a reasonable pre-tax profit. He made this representation even though he had not performed an economic analysis of the transaction or consulted with his investment advisers about the transaction.

At some point after mid-May 1999 KPMG executed a tax opinion letter (tax opinion) dated as of December 31, 1998. The 99-page tax opinion stated that it relied on representations from Mr. Blum, Benzinger GP and QA. KPMG opined that it was more likely than not that (1) Benzinger LP and Benzinger GP would be treated as corporations for U.S. Federal income tax purposes, (2) the amount paid by UBS in redemption of Benzinger LP's UBS shares would be treated as a dividend, (3) Benzinger LP's tax basis in the redeemed UBS shares would be attributed and allocated to the Blum Trust's separately purchased UBS shares and potentially to the Blum Trust's UBS call options, (4) the Blum Trust would not be subject to U.S. tax on the dividend received by Benzinger LP for redeeming its UBS shares and (5) payments made by the Blum Trust to Alfaside under the swap contract would not be subject to U.S. withholding tax. The record does not indicate when or if petitioners received the tax opinion.

VI. <u>Aftermath</u>

KPMG's tax-focused transactions, including OPIS, soon became a topic of governmental and popular interest.

A. <u>Commissioner's Position on OPIS</u>

The Commissioner disagreed with the positions taken in KPMG's "more likely than not" tax opinion and challenged the validity of basis-shifting transactions such as OPIS in July 2001, nearly three years after Mr. Blum entered into the OPIS transaction. The Commissioner rejected the foundations of these transactions and noted that reasons for disallowance could include (1) the redemption does not result in a dividend, (2) the basis shift is improper and (3) there is no stock attribution or basis shift because the transaction serves no purpose other than tax avoidance. Notice 2001-45, 2001-2 C.B. 129.

The next year, the Commissioner issued a settlement initiative for basis-shifting tax shelters, such as OPIS. Announcement 2002–97, 2002-2 C.B. 757. The Commissioner permitted settling taxpayers to claim 20 percent of the claimed losses and waived penalties in certain cases if the settling taxpayers conceded 80 percent of the claimed losses. <u>Id.</u> Later that year, the Commissioner also issued a coordinated issue paper presenting in greater detail his rejection of OPIS transactions. Industry Specialization Program Coordinated Issue Paper, "Basis Shifting" Tax Shelter, 2002 WL 32351285 (Dec. 3, 2002).

B. KPMG's Indictment

Around the same time, KPMG's legal opinions became the focus of the United States Senate Permanent Subcommittee on Investigations' (committee) inquiry into the development and marketing of abusive tax shelters.  The committee eventually focused on four transactions designed and promoted by KPMG, one of which was OPIS.

Facing the possibility of grand jury indictment, KPMG entered into a deferred prosecution agreement (DPA) with the Government in August 2005.  KPMG agreed to the filing of a one-count information charging KPMG with participating in a conspiracy to defraud the United States, commit tax evasion and make and subscribe false and fraudulent tax returns.  It admitted and accepted that it helped high-net-worth individuals evade tax by developing, promoting and implementing unregistered and fraudulent tax shelters.  It further admitted that KPMG tax partners engaged in unlawful and fraudulent conduct, including issuing opinions they knew relied on false facts and representations.  KPMG agreed to pay the Government $456 million, to limit its tax practice to comply with certain guidelines and to cooperate with any investigation about which KPMG had knowledge or information.

Later, during 2005, Federal prosecutors obtained numerous indictments against current and former KPMG employees and

partners.  The indicted individuals were charged with conspiracy and tax evasion for designing, marketing and implementing tax shelters, including OPIS.

    C. Blum v. KPMG

Despite the DPA, KPMG's legal battles continued.  Mr. Blum was one of many clients who sued KPMG in the aftermath of its indictment and the related IRS scrutiny.  He filed a complaint against KPMG in Los Angeles Superior Court at the end of 2009 in connection with the OPIS transaction.

Mr. Blum refers to OPIS and BLIPS in his lawsuit as the "Tax Strategies."  Mr. Blum alleges in his suit that KPMG breached its fiduciary duty to him and induced him to pursue a course of action that he would not have otherwise pursed.  In particular, Mr. Blum alleges that he was induced to invest millions of dollars in the Tax Strategies and to conduct his business to realize taxable income that would be offset by the losses the Tax Strategies generated.  He further claims that, in reliance on KPMG, he did not adopt other strategies to defer or minimize tax liability or make different decisions regarding share sales.  He seeks damages of over $100 million.

VII. Deficiency

As previously mentioned, respondent determined deficiencies in, and penalties regarding, petitioners' Federal income taxes for the years at issue.  Petitioners timely filed a petition with

this Court for redetermination of the positions respondent set forth in the deficiency notice. As previously mentioned, the parties resolved certain issues in their stipulation of settled issues and the Court dismissed those portions of the deficiencies and penalties pertaining to petitioners' BLIPS transaction.

OPINION

The subject transaction presents a case of first impression in this Court. We are asked to decide whether petitioners are entitled to deduct losses from their OPIS transaction. We must also decide whether petitioners are liable for any accuracy-related penalties for underpayments resulting from the OPIS transaction. We begin with the parties' arguments regarding this complicated OPIS transaction.

Petitioners argue that their claimed benefits from the OPIS transaction were taken according to the letter of the tax laws. In support of that position, petitioners argue that OPIS yielded the claimed losses pursuant to the following analysis:

(1) UBS' exercise of the call options and Benzinger LP's sale of the remaining shares to UBS was a redemption of stock under section 317(b).

(2) To determine whether a redemption qualifies as a sale or exchange or as a distribution, the stock attribution rules apply. Secs. 302(c), 318(a). Petitioners argue that, under the stock attribution rules, the Blum Trust was treated as owning the

163,980 shares that are the subject of its call options, in addition to the 10,469 shares that it directly held. See sec. 318(a)(4). Also under these rules, the Blum Trust was treated as owning 50 percent of Benzinger GP, and therefore Benzinger LP was treated as owning the 10,469 shares directly held by the Blum Trust and the 163,980 shares constructively owned by the Blum Trust. See sec. 318(a)(3)(C), (4), (5)(A).

(3) Because of Benzinger LP's constructive ownership of the Blum Trust's UBS shares (both direct and constructive), the UBS redemption of Benzinger LP's shares did not completely terminate Benzinger LP's interest in the corporation. See sec. 302(b)(3). Moreover, petitioners argue that it was not a substantially disproportionate redemption because Benzinger LP was deemed to own the same number of shares before and after step 3 of the transaction under the attribution rules. See sec. 302(b)(2). Petitioners theorize that the UBS redemption is essentially equivalent to a dividend. See United States v. Davis, 397 U.S. 301 (1970). Accordingly, petitioners conclude that the redemption would not be treated as a sale or exchange but would instead be treated as a distribution of property. See sec. 302(a), (d).

(4) UBS had sufficient earnings and profits in 1998, so the distribution pursuant to the UBS redemption would be treated as a

dividend and would not reduce Benzinger LP's tax basis in the redeemed UBS shares.  See sec. 301(c)(1).

(5) Benzinger LP thus retained its tax basis in the UBS shares but did not own any shares directly.  Petitioners took the position and argue that Benzinger LP's basis in the UBS shares therefore could be allocated to the Blum Trust's UBS shares and options because the attribution of shares from the Blum Trust caused the redemption to be treated as a dividend.  See Levin v. Commissioner, 385 F.2d 521 (2d Cir. 1967), affg. 47 T.C. 258 (1966); sec. 1.302-2(c) and Example (2), Income Tax Regs.[18]

Petitioners further posit that the OPIS transaction has economic substance because Mr. Blum entered into it for investment purposes and had a reasonable possibility of profiting from the transaction.  They also urge the Court that they reasonably relied on their long-time tax adviser, so they should not be liable for penalties in case of deficiencies.

Respondent argues petitioners are not entitled to deduct losses from the OPIS transaction because they incorrectly reported their Federal income tax treatment of certain steps.  Specifically, respondent alleges that petitioners' tax treatment

---

[18]Petitioners took the position that UBS' redemption of Benzinger LP's shares was not taxable to the Blum Trust because (a) the equity swap did not, in substance, transfer to the Blum Trust an equity interest in Benzinger LP and (b) the GP call option did not implicate the controlled foreign corporation, foreign personal holding company and passive foreign investment company provisions of the Code.

of the OPIS transaction is incorrect because Benzinger LP never owned the 163,980 UBS shares for Federal income tax purposes and therefore did not have a $45 million basis that could be shifted. Respondent also takes the position that Benzinger LP could not shift its alleged basis to the Blum Trust because UBS' redemption of Benzinger LP's UBS stock was a distribution in a sale or exchange of that stock, and not a dividend. Respondent further argues that petitioners' losses are disallowed because the transaction lacks economic substance.[19]

We agree with respondent that the OPIS transaction lacked economic substance. We admit KPMG painstakingly structured an elaborate transaction with extensive citations to complex Federal tax provisions. The entire series of steps, however, was a subterfuge to orchestrate a capital loss. A taxpayer may not deduct losses resulting from a transaction that lacks economic substance, even if that transaction complies with the literal terms of the Code. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1352–1355 (Fed. Cir. 2006); Keeler v. Commissioner, 243 F.3d 1212, 1217 (10th Cir. 2001), affg. Leema Enters., Inc. v. Commissioner, T.C. Memo. 1999-18. Accordingly, we do not address the parties' arguments regarding the merits of

---

[19]Respondent also argues that petitioners' losses are disallowed under sec. 165 because they were not incurred in a transaction entered into for profit and that they are limited by the at-risk rules in sec. 465. We need not reach these arguments because of our other holdings.

petitioners' treatment of each step within the OPIS transaction. Instead, we begin our analysis with the general principles of the economic substance doctrine.[20]

I. Merits of OPIS Under the Economic Substance Doctrine

A court may disregard a transaction for Federal income tax purposes under the economic substance doctrine if it finds that the taxpayer failed to enter into the transaction for a valid business purpose but rather sought to claim tax benefits not contemplated by a reasonable application of the language and purpose of the Code or its regulations.[21] See, e.g., New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. 161 (2009), affd. 408 Fed. Appx. 908 (6th Cir. 2010); Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288.  There is, however, a split among the Courts of Appeals as to the application of the economic

---

[20]The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous.  Rule 142(a).  The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions.  Sec. 7491(a).  Our resolution is based on a preponderance of the evidence, not on an allocation of the burden of proof.  Therefore, we need not consider whether sec. 7491(a) would apply.  See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

[21]Congress codified the economic substance doctrine mostly as articulated by the Court of Appeals for the Third Circuit in ACM Pship. v. Commissioner, 157 F.3d 231, 247-248 (3d Cir. 1998), affg. in part and revg. in part on an issue not relevant here T.C. Memo. 1997-115.  See sec. 7701(o), as added to the Code by the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, sec. 1409, 124 Stat. 1067; see also H. Rept. 111-443(I), at 291-299 (2010).  The codified doctrine does not apply here pursuant to its effective date.

substance doctrine.  An appeal in this case would lie to the Court of Appeals for the Tenth Circuit absent stipulation to the contrary and, accordingly, we follow the law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

The Court of Appeals for the Tenth Circuit applies a so-called unitary analysis in which it considers both the taxpayer's subjective business motivation and the objective economic substance of the transactions.  See Sala v. United States, 613 F.3d 1249 (10th Cir. 2010); Jackson v. Commissioner, 966 F.2d 598, 601 (10th Cir. 1992), affg. T.C. Memo. 1991-250.  The presence of some profit potential does not necessitate a finding that the transaction has economic substance.  Keeler v. Commissioner, supra at 1219.  Instead, that Court of Appeals requires that tax advantages be linked to actual losses.  See Sala v. United States, supra at 1253; Keeler v. Commissioner, supra at 1218-1219.  It has further reasoned that "correlation of losses to tax needs coupled with a general indifference to, or absence of, economic profits may reflect a lack of economic substance."  Keeler v. Commissioner, supra at 1218.  Applying those standards, we hold that petitioners' OPIS transaction lacks economic substance and we now discuss our underlying reasoning and conclusions for our holding.

A. Prearranged Steps Designed To Generate Loss

Petitioners' OPIS transaction was a structured deal with several components, some straight-forward and some complex. The components of this deal were carefully pieced together to generate, preserve and shift a substantial tax basis so as to obviate petitioners' $45 million capital gain. We conclude, based on the record and the entirety of the transactions, that petitioners' OPIS transaction was designed to create a tax loss that would offset their capital gains from sales of Buy.com shares.

KPMG designed OPIS' prearranged steps to generate a significant, artificial loss. KPMG sought clients with substantial capital gains for the OPIS transaction. Investors were targeted based on their potential capital gains and not their investment profiles. Indeed, KPMG had a minimum capital gains requirement for clients participating in the transaction.

Mr. Blum contends that he had no interest in a tax shelter when he met with Mr. Hasting. The record conflicts, however, with his contention. Mr. Law suggested that Mr. Blum contact KPMG's capital transaction group because he knew that Mr. Blum had potential capital gains from stock sales. Mr. Blum retained KPMG for the OPIS transaction just days before selling $40 million of Buy.com shares. Mr. Blum retained KPMG as his tax adviser, not as his investment adviser.

KPMG intended OPIS as a loss-generating transaction. The OPIS transaction was a prearranged set of steps that, from the outset, was designed and intended to generate a loss. Those circumstances are indicative of transactions lacking economic substance. See Sala v. United States, supra at 1253.

B. Mr. Blum Did Not Approach the Transaction as an Investor

Mr. Blum contends that he did not view the prearranged OPIS steps as a loss-generating transaction, but that he intended to make a potentially high-yielding investment. Petitioners' reliance on this subjective prong of the economic substance analysis is not supported by the facts. We do not accept Mr. Blum's claim that he subjectively believed the OPIS transaction would be profitable because his actions during or after the transaction conflict with his contention.

Mr. Blum's contention concerning his intent on entering into the transaction conflicts, for example, with the KPMG engagement letter for tax consultation services that provides for a tax opinion about losses from the transaction. Mr. Blum's asserted focus on investment does not comport with his retention of QA as an investment adviser when he knew little about and never spoke to anyone at QA. He hired an investment adviser that he did not know and he did so through a tax adviser, which suggests that tax, not investment, was the primary consideration.

Mr. Blum testified that $5 million was a relatively sizable amount of money to him. The record indicates that Mr. Blum essentially entrusted this sizable amount of money to an unknown investment adviser based on two hour-long presentations from his tax adviser. Mr. Blum did not perform an economic analysis of the OPIS transaction, nor did he ask his existing investment advisers to review it. He had no general knowledge of the participants (except for KPMG and UBS) and no understanding of the transaction. Furthermore, Mr. Blum did not track his investment, except to the extent that he received a call from KPMG a month into the deal.

Mr. Blum's actions belie his testimony. His lack of due diligence in researching the OPIS transaction indicates that he knew he was purchasing a tax loss rather than entering into a legitimate investment. See Pasternak v. Commissioner, 990 F.2d 893, 901 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.

Mr. Blum's statements in his subsequent suit against KPMG confirm his lack of subjective profit motive. In his suit, Mr. Blum alleges that he was induced to invest millions of dollars in a tax strategy and to conduct his business so as to realize taxable income that would be offset by losses generated by OPIS. He further claims that, in reliance on KPMG, he did not adopt

other strategies to defer or minimize his tax liability or make different decisions regarding share sales. Mr. Blum's actions during and after the OPIS transaction do not indicate a profit motive.

C. Loss Had No Economic Reality

Petitioners' significant capital losses from the OPIS transaction were not only intentional, but they were also artificial. Indeed, the claimed losses created by the OPIS transaction were prearranged and intended to be artificial. Mr. Blum invested approximately $6 million into the OPIS transaction and lost approximately $1.5 million, yet the transaction generated over $45 million in capital losses. Petitioners' disproportionate losses violated the principle that tax advantages must be linked to actual losses. See Keeler v. Commissioner, 243 F.3d at 1218.

Benzinger LP was able to create an artificial basis in UBS shares, which it otherwise would not have, through Benzinger LP's delayed settlement stock purchase of UBS shares and the collar on those shares. Benzinger LP treated the UBS share redemption as a dividend through its application of the attribution rules and the rules governing redemptions. This treatment had no tax consequences to Benzinger LP, but allowed it to retain its alleged basis in the shares for Federal income tax purposes. Retaining this $45 million basis was crucial. As Benzinger LP no

longer held any interests in UBS shares, its basis allegedly transferred to petitioners' UBS shares and options. Petitioners therefore claimed a substantial capital loss upon selling their UBS shares and expiration of their options.

Petitioners' claimed capital losses far exceeded their investments in the shares and options. Petitioners' claimed loss on their sale of directly-held UBS shares acquired in step 1 of the transaction is particularly significant to the planned tax strategy. In reality, the UBS shares appreciated substantially during this period. Petitioners' earned approximately $1 million (before fees) on their direct investment in UBS shares, yet they claimed a capital loss of over $36 million on the sale.

In other words, petitioners claimed a substantial capital loss because they received a tax-exempt foreign entity's carefully constructed and carefully retained basis in shares that it never actually received. Petitioners incurred no such economic loss of the stated magnitude. Indeed, petitioners do not contest that their loss is fictional. The absence of economic reality is the hallmark of a transaction lacking economic substance. Sala v. United States, 613 F.3d at 1254; see also Coltec Indus., Inc. v. United States, 454 F.3d at 1352; Keeler v. Commissioner, supra at 1218-1219; K2 Trading Ventures, LLC v. United States, ___ Fed. Cl. ___, 2011 WL 5998957 (Nov. 30, 2011).

D. Loss Dwarfs Profit Potential

Petitioners' artificial $45 million loss has no meaningful relevance to the minuscule potential for profit from OPIS. Petitioners' expert, Dr. James Hodder (Dr. Hodder), concluded that petitioners had a 76.3-percent chance of losing money. Despite the high risk, Dr. Hodder concluded that OPIS had potential for high yields that could make the deal an appropriate investment for the right investor. Dr. Hodder calculated that OPIS had a 19.1-percent chance of realizing a $600,000 profit. He further concluded that petitioners had a 7.6-percent chance of realizing a $3 million profit. These amounts are de minimis when compared to petitioners' capital losses of over $45 million from OPIS. The expected tax benefit dwarfs any potential gain such that the economic realities of OPIS are meaningless in relation to the tax benefits. See Sala v. United States, supra at 1254; Rogers v. United States, 281 F.3d 1108, 1116 (10th Cir. 2002). The mere presence of a profit potential does not automatically impute substance where a common-sense examination of the transaction and the record in toto reflects a lack of economic substance. Sala v. United States, supra at 1254; Keeler v. Commissioner, supra at 1219.

E. The Numbers Do Not Add Up

Despite the presence of some profit potential in OPIS, we find that profit was not a primary purpose of the transaction.

The expert testimony presented in this case, while not central to our determination, loosely supports the notion that OPIS was intended to generate a loss.

Petitioners and respondent both provided the Court with expert reports that sought to quantify the profitability of petitioners' OPIS transaction. Petitioners' expert, Dr. Hodder, performed simulations to calculate the expected probability that the Blum Trust would realize a profit when it entered into the OPIS transactions. Dr. Hodder concluded that the deal had a 23.7-percent chance of breaking even before taxes, a 19.1-percent chance of realizing a 10-percent return ($600,000 profit) and a 7.6-percent chance of realizing a 50-percent return ($3 million profit). The greatest chance for profit was in the Blum Trust's direct investment in UBS shares, which was more than twice as likely as the GP call option and the equity swap to yield a profit. Dr. Hodder concluded that the OTM call options were the least likely to yield a profit, with a mere 11.3-percent chance of breaking even.

Dr. Hodder focused on the high volatility in UBS stock prices at the time. Based on his volatility estimates, Dr. Hodder ultimately concluded that OPIS presented a high-risk opportunity that had potential for high rewards. He stated that "[i]t is kind of a long shot gamble, but it is a long shot gamble

with a huge upside, and I don't think that is unreasonable, but it is not something that I would have done."

Dr. Hodder's calculations are helpful, but his conclusion that there is some profit potential does not require us to find that the transaction has economic substance. See Keeler v. Commissioner, 243 F.3d at 1219; see also K2 Trading Ventures, LLC v. United States, ___ Fed. Cl. at ___, 2011 WL 5998957 at *19 ("potential for profit does not in and of itself establish economic substance--especially where the profit potential is dwarfed by tax benefits"). His calculations assume a transaction that was not pre-ordained to create a loss intended specifically to offset a particular gain.

Respondent's expert witness, Dr. A. Lawrence Kolbe (Dr. Kolbe), did not address the question of whether petitioners' OPIS transaction had profit potential. Instead, Dr. Kolbe looked at the net present value and the expected rate of return relative to the cost of capital. He concluded that the OPIS transaction, as a whole, was extremely unprofitable. Dr. Kolbe determined that petitioners' entry into OPIS resulted in an immediate loss of 36 percent of the invested amount because the securities were priced far above their value.

A bad deal or a mispriced asset need not tarnish a legitimate deal's economic substance. A finding of grossly mispriced assets or negative cashflow can, however, contribute to

the overall picture of an economic sham.  See, e.g., <u>Country Pine</u> <u>Fin., LLC v. Commissioner</u>, T.C. Memo. 2009-251.

We note that both experts agreed that the equity swap and the OTM call options were highly overpriced, and neither was able to replicate the final payment from the GP call option based on the record.  We also note that the price of UBS stock rose over 48 percent during the course of petitioners' OPIS transaction, yet petitioners lost hundreds of thousands of dollars from the transaction (without even considering fees) and then claimed millions and millions in losses.  The numbers do not add up.

In sum, the OPIS transaction lacked economic substance.  It was intended to create a significant capital loss and worked exactly as intended.  Accordingly, the OPIS transaction is disregarded for tax purposes and petitioners' claimed losses are disallowed.[22]

---

[22]Respondent alleges that petitioners failed to report $35,311 of income in 1999 in connection with the settlement of the GP call option.  Petitioners claim they were entitled to allocate $35,311 of fees paid to KPMG and QA to the basis of the GP call option and to recover those amounts when the Blum Trust settled the GP call option.  Because we find that the OPIS transaction lacked economic substance and related losses are disallowed without regard to the value or basis of the assets, this issue is now moot.  See <u>Leema Enters., Inc. v. Commissioner</u>, T.C. Memo. 1999-18, affd. sub nom. <u>Keeler v. Commissioner</u>, 243 F.3d 1212 (10th Cir. 2001).

## II. Accuracy-Related Penalties

We now turn to respondent's determination that petitioners are liable for accuracy-related penalties.  A taxpayer may be liable for a 20-percent accuracy-related penalty on the portion of an underpayment of income tax attributable to, among other things, negligence or disregard of rules or regulations.  Sec. 6662(a) and (b)(1).  The penalty increases to a 40-percent rate to the extent that the underpayment is attributable to a gross valuation misstatement.  Sec. 6662(h)(1).  An accuracy-related penalty under section 6662 does not apply to any portion of an underpayment of tax for which a taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).

Respondent determined that the 40-percent accuracy-related penalty applies to petitioners' underpayment resulting from the disallowed losses reported for 1998.  Respondent determined that a 20-percent accuracy-related penalty applies on account of a disallowed loss and omitted income for 1999.  Petitioners deny that they were negligent with respect to 1999 and assert that they meet the reasonable cause exception to the accuracy-related penalties.

### A. Gross Valuation Misstatement

Respondent determined an accuracy-related penalty of 40 percent for a gross valuation misstatement with respect to losses reported from the OPIS transaction for 1998.  A taxpayer may be

liable for a 40-percent penalty on that portion of an underpayment of tax that is attributable to one or more gross valuation misstatements.  Sec. 6662(h).  A gross valuation misstatement exists if the value or adjusted basis of any property claimed on a tax return is 400 percent or more of the amount determined to be the correct amount of such value or adjusted basis.  Sec. 6662(h)(2)(A)(i).  The value or adjusted basis of any property claimed on a tax return that is determined to have a correct value or adjusted basis of zero is considered to be 400 percent or more of the correct amount.  Sec. 1.6662-5(g), Income Tax Regs.

Our holding that the OPIS transaction lacks economic substance results in the total disallowance of the losses at issue without regard to the value or basis of the property used in the OPIS transaction.  See Leema Enters., Inc. v. Commissioner, T.C. Memo. 1999-18.  We have held that the gross valuation penalty applies when an underpayment stems from deductions or credits that are disallowed because of lack of economic substance.  See Petaluma FX Partners, LLC v. Commissioner, 131 T.C. 84, 104-105 (2008), affd. in pertinent part, revd. in part and remanded 591 F.3d 649 (D.C. Cir. 2010). In the absence of a decision of the Court of Appeals for the Tenth Circuit squarely on point, we follow our precedent. Consequently, a gross valuation misstatement accuracy-related

penalty applies to petitioners' underpayment for 1998 absent a showing of reasonable cause or some other defense.

B. Negligence

Respondent also determined that petitioners are liable for the 20-percent accuracy-related penalty because the 1999 underpayment resulting from a disallowed loss and omitted income was due to negligence. Sec. 6662(a) and (b)(1). Negligence is defined as a "lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Viralam v. Commissioner, 136 T.C. 151, 173 (2011). Negligence is strongly indicated where "[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. The deficiency determined by respondent with respect to petitioners' tax return for 1999 is linked to OPIS, a "too good to be true" transaction.

An underpayment is not attributable to negligence, however, to the extent that the taxpayer shows that the underpayment is due to the taxpayer's reasonable cause and good faith. See secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs. The burden is upon the taxpayer to prove reasonable cause. See Higbee v. Commissioner, 116 T.C. 438, 447-449 (2001). We determine whether

a taxpayer acted with reasonable cause and in good faith by considering the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the taxpayer's knowledge and experience and the reliance on the advice of a professional.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Generally, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability.  Id.

C. Reasonable Cause and Good Faith

Petitioners seek to defend against both accuracy-related penalties by asserting that they relied on KPMG to prepare the tax returns and to assure them that the deductions from the OPIS transaction were claimed legally.  The good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may negate an accuracy-related penalty.  See sec. 1.6664–4(b), Income Tax Regs.  A taxpayer may rely on the advice of any tax adviser, lawyer or accountant.  United States v. Boyle, 469 U.S. 241, 251 (1985); Canal Corp. & Subs. v. Commissioner, 135 T.C. 199, 218 (2010).

We look to the facts and circumstances of the case and the law that applies to those facts and circumstances to determine whether a taxpayer reasonably relied on advice.  See sec. 1.6664–4(c)(1)(i), Income Tax Regs.  We have used a three-prong test to guide that review.  Namely, the taxpayer must prove by a preponderance of the evidence that (1) the adviser was a

competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser and (3) the taxpayer actually relied in good faith on the adviser's judgment. 106 Ltd. v. Commissioner, 136 T.C. 67, 77 (2011); Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002). We review petitioners' situation in light of these factors.

First, KPMG was a well-known international "Big Four" accounting firm. It had not yet faced the legal and public scrutiny that ultimately resulted from its structured tax activities. Mr. Law, who had prepared petitioners' tax returns and helped them through the audits of four tax years, referred Mr. Blum to Mr. Hasting. Accordingly, KPMG and its principals had sufficient relevant expertise and properly appeared competent to petitioners.

Petitioners failed, however, to satisfy the second factor. Initially, we observe that petitioners provided KPMG and its principals with all the relevant financial data needed to assess the correct level of income tax. See sec. 1.6664-4(c)(1)(i), Income Tax Regs. Accordingly, KPMG had the necessary and accurate information. Nevertheless, petitioners failed to satisfy the second factor because KPMG's opinion relied upon false representations from Mr. Blum.

The most crucial of these representations was that Mr. Blum independently reviewed the economics underlying the investment strategy and believed it had a reasonable opportunity to earn a reasonable pretax profit. Mr. Blum knew this representation was false, or would have known it if he had read it. The record, as a whole, reflects that the OPIS transaction was structured to fabricate a loss. This loss creation was KPMG's reason for seeking out Mr. Blum and Mr. Blum's reason for engaging in the transaction. Mr. Blum's representations to KPMG are contrary to this fact and are part of the guise that was used to fabricate the intended loss. Petitioners thus failed to satisfy the second factor because Mr. Blum made false representations to KPMG.

KPMG's promotion and facilitation of OPIS concerns the last factor and the heart of the issue. Petitioners certainly relied on KPMG, and KPMG's failures toward its client during and after the years at issue are well-documented. Nevertheless, we do not find that petitioners actually relied on KPMG in good faith for purposes of the reasonable cause and good faith defense to accuracy-related penalties.

Petitioners point to KPMG's 99-page tax opinion on the OPIS transaction, but petitioners did not actually rely on this opinion. The record does not show when the opinion was finalized, but we know that it was finalized after petitioners filed the tax return for 1998. As previously mentioned, KPMG's

opinion also relied upon false representations from Mr. Blum. The opinion on which petitioners allegedly relied was thus belated and based on a false representation.

Petitioners also argue that they received oral advice from KPMG regarding OPIS. KPMG did not, however, describe the tax opinion to Mr. Blum when he was entering into the transaction.[23] Mr. Blum also did not recount any oral advice that would have supported his argument of reasonable reliance. Petitioners have failed to satisfy their burden of showing that they reasonably relied on oral advice.

Finally, we hold that petitioners could not have reasonably relied on KPMG because of its role as a promoter. Reliance is unreasonable if the adviser is a promoter of the transaction or suffers from an inherent conflict of interest of which the taxpayer knew or should have known. Neonatology Associates, P.A. v. Commissioner, supra at 98. We have held that, when the transaction involved is the same tax shelter offered to numerous parties, we adopt the following definition of promoter: "'an adviser who participated in structuring the transaction or is

---

[23]The engagement letter also did not provide a description of the opinion letter that would be provided upon request. The engagement letter stated that the opinion letter would rely on "appropriate" facts and representations and would provide that the tax treatment described in the opinion would "more likely than not" be upheld. It provided no details regarding the tax treatment to be described in the opinion or the facts and representations that would be required before the opinion could be issued.

otherwise related to, has an interest in, or profits from the transaction.'" 106 Ltd. v. Commissioner, supra at 79-80 (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121). KPMG sought clients with significant capital gains and structured the OPIS deal for petitioners and numerous other clients. KPMG was a promoter of OPIS and its obvious conflict makes petitioners' reliance unreasonable.

Petitioners claimed an artificial loss of over $45 million. This is exactly the type of "too good to be true" transaction that should cause a savvy, experienced businessman to seek independent advice. See Neonatology Associates, P.A. v. Commissioner, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."); New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. at 195. Petitioners' decision to rely exclusively on KPMG in structuring, facilitating and reporting their OPIS transaction was therefore not reasonable. Petitioners did not take their position in good faith and thus lacked reasonable cause for that position. Accordingly, we sustain respondent's determination that petitioners are liable for accuracy-related penalties for 1998 and 1999.

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant, moot, or meritless.

To reflect the foregoing and due to the parties' concessions,

<u>Decision will be entered under Rule 155</u>.