T.C. Memo. 2012-106

UNITED STATES TAX COURT

JOHN PAUL REDDAM, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22557-08.                          Filed April 11, 2012.

<u>Jeffrey A. Hartman</u>, <u>David W. Wiechert</u>, and <u>Jessica C. Munk</u>, for petitioner.

<u>H. Clifton Bonney, Jr.</u>, <u>Elizabeth S. Martini</u>, <u>Mary E. Wynne</u>, and <u>James P.</u>
<u>Thurston</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent issued a notice of deficiency disallowing

petitioner's claimed capital loss deduction of $50,164,421 and making a

corresponding computational adjustment regarding claimed itemized deductions of $366,759 for the 1999 tax year. These adjustments resulted in an $8,209,727 deficiency. Respondent's determination stems from petitioner's participation in an Offshore Portfolio Investment Strategy (OPIS transaction). Petitioner timely filed a petition with this Court.[1]

The sole issue for decision is whether petitioner is entitled to deduct the capital losses. We hold that petitioner may not deduct the capital losses because his investment in the OPIS transaction lacked economic substance.[2]

## FINDINGS OF FACT

Petitioner resided in California at the time his petition was filed. In 1995 petitioner formed DiTech Funding Corp., DiTech Escrow Corp., and DiTech Real Estate Corp. (collectively referred to as DiTech).[3] Petitioner was the sole shareholder, chief executive officer, and chairman of the board of each DiTech entity until the sale of the assets of those entities in 1999. DiTech engaged in the

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue.

[2]This court has recently held that a similarly structured OPIS transaction was devoid of economic substance. See Blum v. Commissioner, T.C. Memo. 2012-16. Our conclusion is in accord with this prior holding.

[3]Each DiTech entity was an S corporation for Federal income tax purposes.

business of originating, underwriting, purchasing, selling, and servicing residential mortgage loans. The business quickly evolved into a very successful enterprise; by 1998 DiTech had grown to 700 employees and was generating approximately $45 million in annual revenue.

Petitioner maintained a longstanding professional relationship with KPMG Peat Marwick LLP (KPMG),[4] an international accounting firm, which continued throughout the period at issue. Petitioner initially hired KPMG, in 1994, to serve as an outside auditor for SC Funding, a separate company that petitioner had previously operated. Scott Carnahan was the KPMG audit partner originally assigned to audit SC Funding. Eventually, Carnahan left KPMG and became the president of DiTech on July 1, 1998.

I. Petitioner's Sale of DiTech

In 1997 petitioner began to consider monetizing some of his personal shareholdings in DiTech. After discussions with PaineWebber, DiTech's investment adviser, in the fall of 1997 petitioner considered taking DiTech public though an initial public offering (IPO). In June 1998 DiTech announced tentative plans for a potential IPO of a minority interest in DiTech; however, PaineWebber

---

[4]The firm's name was later shortened by removing "Peat Marwick".

eventually recommended delaying the IPO until market conditions became more favorable for the successful implementation of the plan.

In October 1998 petitioner was approached by representatives of the GMAC Mortgage Corp. (GMAC) concerning a potential purchase of DiTech. Petitioner negotiated the major points of the deal with GMAC, including how pricing for the transaction would be structured. In April 1999 DiTech agreed to sell substantially all of its assets to GMAC. The purchase price consisted of a "closing payment" and an "earn out" payment to be made over a period of years. GMAC paid DiTech approximately $70 million for the closing payment in 1999. Under the terms of the asset purchase agreement, petitioner was entitled to potential future earn out payments in excess of $170 million.

Petitioner recognized ordinary income and a $48,489,549 capital gain as a result of the sale of the assets in 1999.

II. Petitioner's Attempts To Minimize Taxes

Around the same time petitioner sought to monetize his DiTech holdings, he also began to consider various ways to reduce his overall tax liabilities. Petitioner considered moving his business and residence to Nevada in an attempt to eliminate State income taxes, and he traveled to Nevada in 1997 to search for potential

homes. Petitioner also became aware that KPMG was offering certain tax strategies which might be beneficial to a taxpayer with petitioner's tax portfolio.

In early 1998 petitioner was introduced by Mr. Carnahan, then still with KPMG, to Carl Hasting, a partner at KPMG. Mr. Hasting was selling products to clients with large gains or significant incomes. One such product was the OPIS transaction.

The OPIS transaction was developed and sold by KPMG and implemented with the assistance of Presidio Advisors LLC (Presidio) and Deutsche Bank AG (Deutsche Bank). In general terms, the OPIS transaction was structured to shift additional tax basis to a taxpayer's equity investment and options in a large financial institution. Shortly after the purported basis shift, the taxpayer would sell the equity interest and options, resulting in a large capital loss. The benefits of the OPIS transaction as advertised by KPMG were that it: (1) enabled a U.S. investor to maximize leverage in stock of a foreign bank and thereby potentially increase investment return; and (2) maximized the U.S. investor's basis in foreign bank stock, thereby minimizing gain, or maximizing loss, on the disposition of such stock.

At the time of his initial meeting with Mr. Hasting, petitioner had not yet sold DiTech and was not immediately interested in participating in any tax planning to

minimize taxable gains. Nonetheless, petitioner continued to engage in a series of meetings with Mr. Hasting in the spring of 1998 to discuss various tax strategies. Some time after Mr. Carnahan began working for DiTech, Mr. Hasting presented the OPIS transaction to petitioner. Mr. Carnahan understood that the transaction was structured to eliminate, not simply defer, a tax gain for a participant; however, as Mr. Carnahan was not particularly knowledgeable in tax law, he did not understand the OPIS transaction in any detail.

After Mr. Hasting described the transaction to petitioner, petitioner asked Mr. Carnahan to inquire as to whether other accounting firms were offering other similar products. In response, Mr. Carnahan initiated individual dialogues with representatives from Pricewaterhouse, Deloitte, and Ernst & Young, all international accounting firms. Representatives from both Pricewaterhouse and Deloitte believed that they offered similar products, and they each asked to speak with petitioner in an attempt to sell their respective transactions; however, the Ernst & Young representative offered only a tax deferral product and expressed his misgivings that the KPMG transaction, as structured, did not "work". Mr. Carnahan relayed all the information he received from the representatives to petitioner.

Mr. Carnahan, while limited in his understanding of the transactions, advised petitioner that there was no clear differentiation between the KPMG plan and the other plans offered by the accounting firms. Mr. Carnahan also noted that the "more likely than not" opinions issued by the KPMG national office as well as Brown & Wood in support of the OPIS transaction were "valuable documents". Nonetheless, Mr. Carnahan did not advise petitioner on the investment aspects of the transaction and specifically requested that petitioner hire competent counsel to provide more technical tax advice. Petitioner never heeded Mr. Carnahan's suggestion and continued his consideration of the OPIS transaction without the aid of outside counsel.

Petitioner met with Mr. Hasting again in the fall of 1998. Shortly thereafter, Mr. Hasting had petitioner execute a nondisclosure agreement which provided that petitioner could not discuss the details of the OPIS transaction with others without KPMG's prior written consent. Petitioner was also advised to form a grantor trust to execute the transaction. On April 27, 1999, petitioner formed the J. Paul Reddam Trust (Reddam Trust)[5] for this purpose.

---

[5]Generally, a grantor trust is disregarded as an entity for Federal income tax purposes. See sec. 671; see also Blum v. Commissioner T.C. Memo. 2012-16. Accordingly, petitioner and the Reddam Trust are coterminous for purposes of this opinion. We will refer to both the Reddam Trust and petitioner as "petitioner"

(continued...)

On May 19, 1999, petitioner executed an engagement letter with KPMG related to the OPIS strategy. In the letter KPMG recommended that petitioner seek independent advice concerning the investment aspects of the transaction and stated that the minimum fee for KPMG's services would be $597,500. A revised engagement letter later increased this minimum fee to $622,500.

At the request of KPMG, petitioner also engaged the services of Presidio to implement the OPIS transaction. Petitioner had not previously used the services of Presidio and never communicated with anyone at Presidio about the transaction.

III. OPIS Entities

In addition to Reddam Trust, several entities were formed with the assistance of Presidio to facilitate the OPIS transaction: (1) a domestic limited liability company, Clara Street LLC (Clara LLC), owned by a foreign person; (2) a Cayman Islands corporation, Clara Street Ltd. (Clara Ltd.); and (3) a Cayman Islands limited partnership, Cormorant LP (Cormorant). Clara LLC owned 500 shares of Clara Ltd. and an unrelated third party owned 1 share. Clara LLC was also the limited partner of Cormorant; Clara Ltd. was the general partner.

---

[5](...continued)
unless clarity dictates that we differentiate them.

As part of petitioner's OPIS transaction, Reddam Trust, Clara LLC, and Clara Ltd. opened individual accounts with Deutsche Bank. Reddam Trust and Cormorant's accounts were characterized as "portfolio accounts" (respectively, petitioner's and Cormorant's DB portfolio accounts). Cormorant's DB portfolio account was divided into a U.S. dollar subaccount, a euro subaccount, and a security subaccount. Reddam Trust gave John Larson, a principal of Presidio, trading authority over petitioner's DB portfolio account.

IV. The OPIS Transactional Structure

The OPIS transaction incorporated a series of coordinated steps. Petitioner referred to this structure as a "formula" or "recipe".

On May 25, 1999, Presidio instructed petitioner to wire $6 million to petitioner's DB portfolio account. According to the instructions, $2.5 million was to be used by petitioner to purchase a "long position in Deutsche Bank common stock" and the remaining $3.5 million was to be used for the purchase of both a swap and a call option, discussed infra.

Petitioner wired $6 million into petitioner's DB portfolio account on May 26, 1999. The same day, the $6 million was converted to EUR 5,736,686.10.

Step 1:  Petitioner Purchased Deutsche Bank Stock.

On May 27, 1999, petitioner purchased 45,834 shares of Deutsche Bank AG common stock at EUR 52.15 per share.  The net amount paid for the stock was EUR 2,390,721.15.  This consisted of EUR 2,390,243.10 for the stock and a fee of EUR 478.05.

Step 2:  Petitioner Entered Into a Swap Transaction With Clara LLC.

On May 25, 1999, petitioner entered into an International Swap Dealers Association Master Agreement and Schedule (ISDA agreement)[6] with Clara LLC. Two days thereafter, petitioner entered a "Rate Swap Transaction" (the swap agreement) with Clara LLC, which, in part, supplemented the ISDA agreement.

Pursuant to the terms of the swap agreement, petitioner was to make two "fixed rate payments" to Clara LLC totaling EUR 3,274,692.  The first of the payments was due on May 25, 1999, in the amount of EUR 1,601,492.  The second payment of EUR 1,673,200 was due on July 6, 1999.  The swap agreement

---

[6]ISDA is a trade organization of participants in the market for over-the-counter derivatives.  ISDA has created a standardized contract, the ISDA master agreement, which functions as an umbrella agreement and governs all swaps between the parties to the ISDA master agreement.  See generally K3C Inc. v. Bank of Am., N.A., 204 Fed. Appx. 455, 459 (5th Cir. 2006).

also contained a provision entitled the "prepayment option" which reduced the total amount of payments petitioner was required to make to EUR 3,202,983 if petitioner opted to pay EUR 2,882,685 on May 27, 1999.

In return, Clara LLC agreed to pay petitioner a "floating rate payment" on August 23, 1999. The floating rate payment was defined in the swap agreement as an amount in euro equal to:

(1) 80% of the appreciation on the number of shares of common stock of Deutsche Bank AG ("Deutsche Bank Common Stock") that could be purchased with EUR 4,780,572 at the Kassa Kurs price per share (the "Kassa Kurs Price") for Deutsche Bank Common Stock on the Frankfurt Stock Exchange on * * * [May 27, 1999]. Appreciation will be determined based on the difference between the Kassa Kurs Price per share for Deutsche Bank Common Stock on the Frankfurt Stock Exchange on * * * [May 27, 1999] and the closing price per share for Deutsche Bank Common Stock on the Frankfurt Stock Exchange on * * * [July 6, 1999].

(2) 90% of the product of (i) the positive excess (if any) of the Average Price of Deutsche Bank Common Stock over 104% of the Deutsche Bank Common Stock Kassa Kurs Price on * * * [May 27, 1999], and (ii) the number of shares of Deutsche Bank Common Stock that could be purchased with EUR 15,296,002 at the Kassa Kurs price on the Frankfurt Stock exchange on * * * [May 27, 1999]. Average Price is the arithmetic mean of the closing EUR price per share on the Frankfurt Stock Exchange on each Exchange Business Day during the period from and including * * * [May 27, 1999] to but excluding * * * [July 6, 1999], determined by dividing the sum of such closing prices by the number of Exchange Business Days in such period.

(3)   90% of the product of (i) the number of shares of Deutsche Bank Common Stock that could be purchased with EUR 22,943,977 multiplied by (ii) the positive excess (if any) of the closing EUR price per share quoted on the Frankfurt Stock Exchange on * * * [July 6, 1999] over 106% of the Deutsche Bank Common Stock Kassa Kurs Price on * * * [May 27, 1999], multiplied by (iii) the Fade-In Ratio. The Fade-In Ratio is the ratio of (i) the number of Exchange Business Days from and including * * * [May 27, 1999], but excluding * * * [July 6, 1999] on which a Fade-In Event occurred, divided by (ii) the total number of Exchange Business Days from, and including, * * * [May 27, 1999] to, but excluding, * * * [July 6, 1999].  A Fade-In Event * * * [occurs] each Exchange Business Day where the price of Deutsche Bank Common Stock trades at EUR price greater than 93% of the Deutsche Bank Common Stock Kassa Kurs Price on * * * [May 27, 1999], but less than 106% of the Deutsche Bank Common Stock Kassa Kurs Price on * * * [May 27, 1999].

(4)   However, in no event will the Floating Rate Payment be less than the EUR equivalent of US$622,500.

The ISDA agreement required petitioner to provide Clara LLC with "credit support documents" consisting of:  (1) a certificate of deposit maturing July 6, 1999, issued by Deutsche Bank AG, New York Branch (Deutsche Bank-New York) to petitioner in the face amount of EUR 320,298; (2)  a pledge and security agreement (U.S. investor's pledge agreement); and (3)  an account control agreement (U.S. investor's account control agreement).

Petitioner contemporaneously executed the U.S. investor's pledge agreement which assigned to Clara LLC a continuing possessory lien and an enforceable perfected security interest in "pledged collateral", including

"[petitioner's second fixed-rate payment and petitioner's DB portfolio account] together with all funds therein, or deposited thereto from time to time and all investments, financial assets, investment property or general intangibles from time to time therein". The U.S. investor's pledge agreement also provided Clara LLC with sole dominion and control over petitioner's DB portfolio account.

The U.S. investor's account control agreement served to perfect Clara LLC's security interest in petitioner's second fixed-rate payment and petitioner's DB portfolio account. The agreement also directed that at the maturity date of petitioner's second fixed-rate payment, July 6, 1999, the payment and all other funds on deposit in petitioner's DB portfolio account were to be paid to Clara LLC.

Step 3:  Petitioner Purchased a Call Option From Clara LLC.

In addition, on May 25, 1999, petitioner purchased a call option (GP call option) from Clara LLC for $150,000. The GP call option gave petitioner the right to require Clara LLC to either:  (1) sell to petitioner 50% of the issued and outstanding shares of common stock that Clara LLC owned in Clara Ltd. at $500 per share; or (2) pay petitioner a cash settlement price based on the "Net Asset

Value" of Clara Ltd. Petitioner could exercise his rights under the GP call option beginning on July 24, 1999. The expiration date of the GP call option was May 25, 2000.

On May 28, 1999, Presidio instructed Deutsche Bank to transfer EUR 3,026,102 from petitioner's DB portfolio account to Clara LLC's Deutsche Bank account. This amount constituted: (1) petitioner's first fixed rate payment of EUR 2,882,685 pursuant to the "prepayment option" in the swap agreement with Clara LCC, and (2) petitioner's purchase of the call option for EUR 143,417 ($150,000).

Step 4: <u>Cormorant Purchased Deutsche Bank Stock With Proceeds From a Deutsche Bank Loan</u>.

Cormorant and Deutsche Bank AG, Cayman Islands Branch (Deutsche Bank-Cayman), entered into a credit agreement dated May 27, 1999. The credit agreement provided that Deutsche Bank-Cayman would lend Cormorant the euro equivalent of $42,100,000 to be repaid in full on July 8, 1999. The loan proceeds had to be used exclusively for the purpose of purchasing shares of stock in Deutsche Bank, and Cormorant was prohibited from selling, assigning, transferring, disposing of, or pledging or conveying a security interest in such stock at any point.

Section 4.01 of the credit agreement enumerated a series of conditions that needed to be satisfied or waived by Deutsche Bank-Cayman before the credit agreement would become effective. Pursuant to the section, Clara LLC was required to deliver to Deutsche Bank-Cayman a draft of the ISDA agreement with related documents, as well as an executed copy of the GP call option. Clara LLC was also required to execute and deliver a pledge and security agreement together with account opening documents. In that agreement, Clara LLC pledged, assigned, and granted to Deutsche Bank-Cayman a continuing possessory lien and an enforceable perfected security interest in "pledged collateral", including:

> (a) all of * * * [Clara LLC's] rights, title and interest in * * * [100% of the shares of capital stock that Clara LLC owned in Clara Ltd.] * * * ;

> (b) all of [Clara LLC's] rights, title and ownership interest in the * * * [limited partner interest that Clara LLC owned in Cormorant]. * * * ; and

> (c) all proceeds of any and all of the foregoing Pledged Collateral including, without limitation, proceeds that constitute property of the types described above.

Clara Ltd. was similarly required to deliver a pledge and security agreement executed together with account opening documents (Cayman corporation pledge

agreement).  In the Cayman corporation pledge agreement Clara Ltd. pledged, assigned, and granted to Cormorant a continuing possessory lien and an enforceable perfected security interest in "pledged collateral", including:

     (a)  * * * [Clara Ltd.'s Deutsche Bank account] and all funds held therein or deposited thereto from time to time, all investments, financial assets, investment property and other property credited thereto or deposited therein * * *;

     (b)  all indebtedness from time to time owed to * * * [Clara LLC] by any obligor of the Pledged Collateral referred to in paragraph (a) above, and the instruments evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all such Pledged Collateral; and

     (c)  all proceeds of any and all of the foregoing Pledged Collateral * * *.

The Cayman corporation pledge agreement further provided Cormorant with "sole dominion and control" over Clara Ltd.'s Deutsche Bank account.   A separate account control agreement (Cayman corporation account control agreement), executed the same day as the Cayman corporation pledge agreement, perfected Cormorant's security interest in Clara Ltd.'s Deutsche Bank account.

The credit agreement also required the sole member of Clara LLC, an unrelated foreign individual, to enter into a "member's agreement" with Deutsche Bank-Cayman.  Pursuant to the member's agreement, the member could not

"transfer, sell, pledge, assign, mortgage, convey or otherwise dispose of * * * his interest in * * * [Clara LLC]" except with respect to the contemplated pledge of his interest to Deutsche Bank-Cayman.  Further, the member was restricted from taking any action that would result in any person or entity other than Clara LLC "having any ownership or control over * * * [Clara LLC's] interest or the rights attendant to * * * [Clara LLC's] interest in * * * [Cormorant], or enter into any agreement which would or could result in the loss of such ownership or control". The member was similarly restricted from taking any action that would result in Clara LLC's losing ownership or control in Clara Ltd.

The sole member of Clara LLC also executed a "member's assignment agreement" agreeing to assign, pledge, and grant to Deutsche Bank-Cayman a continuing possessory lien and an enforceable perfected security interest in his membership interest in Clara LLC.

Cormorant's obligations under the credit agreement included executing and delivering to Deutsche Bank-Cayman a pledge and security agreement with account opening documents (U.S. pledge agreement) and an account control agreement (U.S. account control agreement).  Pursuant to the U.S. pledge agreement, Cormorant pledged, assigned, and granted to Deutsche Bank-Cayman a

continuing possessory lien and an enforceable perfected security interest in the

following "pledged collateral":

(i) * * * [Cormorant's security subaccount] and all security entitlements related thereto, all financial assets, investment property and other property credited thereto or deposited therein from time to time, including but not limited to all shares (including, without limitation, any shares of the common stock of Deutsche Bank AG), certificates representing shares, beneficial interest in shares, interest, cash, funds, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all financial assets, investment property and other property in * * * [Cormorant's security subaccount], or representing or evidencing * * * [Cormorant's security subaccount], and all cash and non-cash proceeds thereof (together with * * * [Cormorant's security subaccount], (the "Pledged Securities"); [Emphasis supplied.];

(ii) all indebtedness from time to time owed to * * * [Cormorant] by any obligor of the Pledged Securities * * * ;

(iii) * * * [Cormorant's euro subaccount] together with all funds held therein, or deposited thereto from time to time and all investments, financial assets, investment property or general intangibles from time to time therein * * *;

* * * * * * *

(v) all of * * * [Cormorant's] rights, claims, powers, privileges, remedies, title and interests in the * * * [Cayman corporation pledge agreement] and the transactions thereunder and all of * * * [Cormorant's] rights in the securities and security interests referenced therein * * * ;

(vi) all of * * * [Cormorant's] rights, claims, powers, privileges, remedies, title and interests in the * * * [Cayman corporation account

control agreement] and the transactions thereunder and all of * * * [Cormorant's] rights in the securities and security interests referenced therein * * *

The U.S. pledge agreement also provided Deutsche Bank-Cayman with "sole dominion and control" over the euro subaccount and the security subaccount of Cormorant's DB portfolio account.

The separate U.S. account control agreement was executed in conjunction with the U.S. pledge agreement with the purpose of perfecting Deutsche Bank-Cayman's security interest in Cormorant's security subaccount. The U.S. account control agreement ended only upon notice from Deutsche Bank-Cayman that its security interest in Cormorant's security subaccount had terminated.

Pursuant to the credit agreement, on May 31, 1999, Cormorant executed a notice of borrowing requesting that Deutsche Bank-Cayman lend Cormorant the principal amount of EUR 44,000,000. Cormorant simultaneously issued a note payable to Deutsche Bank-Cayman for the same amount. Thereafter, Deutsche Bank-Cayman deposited EUR 47,800,000 into the euro subaccount of Cormorant's DB portfolio account.

Cormorant used the loan proceeds to purchase 919,931 shares of Deutsche Bank stock at EUR 51.95 per share. The net amount paid was EUR 47,799,415.45, consisting of EUR 47,790,415.45 for the stock and EUR 9,558.08

for a fee.  The 919,931 shares of stock were held in the security subaccount of

Cormorant's DB portfolio account.

Step 5:   Cormorant Purchased Options From and Sold Options to
Deutsche Bank.

On May 27, 1999, Cormorant and Deutsche Bank entered into a share option

agreement.  Pursuant to the share option agreement, Cormorant purchased from

Deutsche Bank:  (1) one put option covering 920,115 shares of Deutsche Bank

stock; (2)  294,437 European-style Asian call options; and (3) 441,655 European-

style fade-in options.  Deutsche Bank in turn purchased from Cormorant a series of

four European-style call options.  The stated premium that Deutsche Bank would

pay Cormorant for all the transactions was EUR 2,370,000 although the share

option agreement did not set forth a separate premium amount for each transaction.

a.  The Options Acquired by Cormorant

i.  The European-Style Put Option

The European-style put option acquired by Cormorant, by definition, could be

exercised only on its defined expiration date of July 6, 1999, at a strike price of

EUR 46.76 Euros per share.

### ii.  The European-Style Asian Call Options

The European-style Asian call options allowed Cormorant to receive a cash settlement amount equal to the product of:  (1)  the positive excess (if any) of the "Average Price" over the "Strike Price" (EUR 54.03 per share) and (2) the "Number of Options" (294,437).  The "Average Price" was defined as the arithmetic mean of the closing euro price of Deutsche Bank stock from May 28 to July 5, 1999.

### iii.  The European-Style Fade-In Options

The European-style fade-in options allowed Cormorant to receive a cash settlement amount equal to the product of:  (i) the "Number of Options" (441,655) multiplied by (ii) the "Option Entitlement" multiplied by (iii) the positive excess (if any) of the closing euro price per share of Deutsche Bank AG common stock as quoted on the Eurex Stock Exchange on the "Fade-In End Date" (July 6, 1999) over the "Strike Price" (EUR 55.07 per share)  multiplied by the (iv) "Fade-In Ratio". The share option agreement defined the "Option Entitlement" as 1 share per option.

The "Fade-In Ratio" was set as:  (i) the number of "Exchange Business Days" from, and including, the "Fade-In Start Date" (May 28, 1999) to, but excluding, the "Fade-In End Date" (July 6, 1999) on which a "Fade-In Event"

occurred, divided by, (ii) the total number of "Exchange Business Days" from, and including May 28, 1999, to, but excluding, July 6, 1999.

The share option agreement defined the "Fade-In Event" as the point when the euro price per share of common stock of Deutsche Bank based on the closing euro price per share of Deutsche Bank common stock quoted on the Eurex Stock Exchange on any "Exchange Business Day" from, and including, the "Fade-in Start Date" (May 28, 1999) to, but excluding, the "Fade-in End Date" (July 6, 1999) is greater than the "Lower Band Price" (EUR 48.01 per share) but less than the "Upper Band Price" (EUR 55.07 per share).

### b. The Options Acquired by Deutsche Bank

#### i. The Series of Four European-Style Call Options

Pursuant to the first European-style call option, Deutsche Bank would purchase 828,104 shares of Deutsche Bank stock from Cormorant on July 6, 1999, if the option was "in the money". The strike price for this first option was 49.35 Euros per share. By definition, Deutsche Bank could exercise its option only on that date; however, the call option would terminate ("knock out") if at any time after May 27, 1999, and before July 6, 1999, the price of Deutsche Bank stock was equal to or less than EUR 49.35 per share.

The second European-style call option came into effect (knocked in) only if the first call option was knocked out. The second option enabled Deutsche Bank to purchase the same 828,104 shares of Deutsche Bank stock from Cormorant on July 6, 1999, if the option was "in the money". The strike price for the call option was EUR 48.31 per share. The second call option would knock out if at any time after May 27, 1999, and before July 6, 1999, the price of Deutsche Bank stock was equal to or less than EUR 48.31 per share.

The third European-style call option knocked in if the second call option knocked out. The third call option allowed Deutsche Bank to purchase the shares of Deutsche Bank stock from Cormorant if the stock was "in the money" on the same date as the prior options. The strike price for the third call option was EUR 47.27 per share. The third call option would knock out if at any time after May 27, 1999, and before July 6, 1999, the price of Deutsche Bank stock was equal to or less than EUR 47.27 per share.

In accord with the other options, the fourth call option knocked in after a knockout of the third call option and allowed Deutsche Bank to purchase the shares of Deutsche Bank stock from Cormorant if the option was "in the money" on the designated date. The strike price for the fourth call option was EUR 46.76 per share.

Step 6:  Deutsche Bank Redeemed the 919,931 Shares From Cormorant.

On June 30, 1999, Presidio sent instructions to Deutsche Bank to exercise the put and call options as follows:

Scenario 1:  On July 6, 1999 if the closing price of Deutsche Bank common stock is greater than 46.76 then, Cormorant L.P.  (the Seller) is to sell 91,827 shares of Deutsche Bank common stock to Deutsche Bank (the Buyer) simultaneous with Cormorant L.P.'s sale of 828,104 shares of Deutsche Bank common stock pursuant to the exercise of its call option.

Scenario 2: On July 6, 1999 if the closing price of Deutsche Bank common stock is 46.76 or lower, then Cormorant L.P.  (the Seller) is to put 919,931 shares of Deutsche Bank common stock to Deutsche Bank pursuant to the exercise of its put option.

On July 6, 1999, Cormorant sold 828,104 shares of Deutsche Bank stock at EUR 49.35 per share (EUR 40,866,932 in total) pursuant to the share option agreement it had entered into with Deutsche Bank.  Cormorant also sold their remaining 91,827 shares of Deutsche Bank Stock at EUR 61.47 per share (EUR 5,644,605.69 in total) in accord with Presidio's instructions.

Step 7:  Petitioner Purchased 919,931 OTC Call Options From Deutsche Bank.

On June 16, 1999, Presidio instructed petitioner to wire $625,000 to petitioner's DB portfolio account for the purchase of "OTC Call Options".  Petitioner wired those funds on June 24, 1999.  Four days later the funds were

converted into EUR 601,250.60. On July 6, 1999, petitioner entered into a share option transaction with Deutsche Bank whereby petitioner purchased 919,931 call options from Deutsche Bank with the euro previously deposited in his DB Portfolio. The 919,931 call options consisted of 229,983 American-style call options and 689,948 European-style call options. The share option transaction agreement did not set forth a separate premium amount for the American-style call options and the European-style call options.

### a. The American-Style Call Options

The 229,983 American-style call options could be exercised at any time up to and including their defined expiration date of August 20, 1999. The strike price for the call options was EUR 64.55 per share.

### b. The European-Style Call Options

The 689,948 European-style call options, by definition, could be exercised only on their established expiration date of August 20, 1999. The strike price for the call options was set at the sum of (i) 25% of "Level A" and (ii) 75% of "Level B".

"Level A" was defined as 103% of the sum of the closing euro prices per share of Deutsche Bank common stock (based upon closing prices quoted on the Eurex Stock Exchange) on each "Exchange Business Day" during the period from

the "Asian Call Start Date" (July 7, 1999) to but excluding the "Asian Call End Date" (August 20, 1999) and dividing that sum by the number of "Exchange Business Days" in that period.

"Level B" was defined as 99.9% of the closing euro price per share of common stock (based upon closing price quoted on the Eurex Stock Exchange) on August 20, 1999.

Step 8: <u>Petitioner Settled the GP Call Option With Clara LLC</u>.

On July 30, 1999, petitioner executed an "Election for Cash Settlement" in connection with the GP call option.  At that time, the cash settlement amount was $98,056.70.  On August 17, 1999, Clara LLC sent two faxes to petitioner. The first fax acknowledged receipt of petitioner's "Election for Cash Settlement"; the second represented that all the events had occurred to determine the floating rate payment that Clara LLC was to forward to petitioner pursuant to the swap agreement.  That payment amount was confirmed as $3,007,815.11.

Step 9: <u>Petitioner Sold the European-Style Call Options Back to Deutsche Bank</u>.

On July 12, 1999, petitioner sold the European-style call options back to Deutsche Bank for EUR 813,000 ($833,433).

Step 10:  Petitioner Sold His Shares of Deutsche Bank Stock.

On August 6, 1999, petitioner sold his 45,834 shares of Deutsche Bank stock for a net of EUR 2,745,365.76.

IV.  Petitioner's Basis Computations

KPMG performed petitioner's basis computations for each of the distinct transactional elements within the OPIS transaction as follows:[7]

The 45,834 shares of Deutsche Bank stock:

| | |
|---|---|
| Purchase price of shares | $2,491,848.65 |
| Allocated basis from Cormorant | 41,092,368.71 |
| Allocated KPMG fees | 234,767.39 |
| Total basis in investor's stock | 43,818,984.78 |

The 919,931 OTC call options:

| | |
|---|---|
| Purchase price of shares | $615,439.50 |
| Allocated basis from Cormorant | 8,729,543.70 |
| Allocated KPMG fees | 57,983.11 |
| Total basis in investor's options | 9,402,966.30 |

---

[7]KPMG miscalculated petitioner's total basis in the Deutsche Bank stock and the OTC call options by a few cents.  The total basis should be for each should be $43,818,984.75 and $9,402,966.31, respectively.

The swap transaction:

| | |
|---|---|
| Basis in investor's swap (cost) | $3,350,000.00 |
| Allocated KPMG fees | 315,617.38 |
| Total basis in investor's swap | 3,665,617.38 |

The GP call option:

| | |
|---|---|
| Basis in investor's call option (cost) | $150,000.00 |
| Allocated KPMG fees | 14,132.12 |
| Total basis in investor's option | 164,132.12 |

## V. Petitioner's Claimed Tax Losses for the 1999 Tax Year

Petitioner claimed a deduction for $50,164,421 in capital losses on his 1999 tax return as a result of his participation in the OPIS. The 1999 tax return included a statement entitled "Capital Gain Detail" which separated petitioner's total capital loss from the OPIS transaction into parts reflecting the distinct transactions which made up the complicated financial arrangement. The "Capital Gain Detail" reflected, in relevant part, the following:

| Description | Sale price | Cost basis | Gain/(Loss) |
|---|---|---|---|
| The DB stock | $2,947,974 | $43,818,985 | ($40,871,011) |
| The OTC call options | 833,433 | 9,402,966 | (8,569,533) |
| The swap transaction | 3,007,815 | 3,665,617 | (657,802) |
| The GP call option | 98,057 | 164,132 | (66,075) |
| Total | 6,887,279 | 57,051,700 | (50,164,421) |

## VI. Expert Witnesses

Respondent and petitioner had expert witnesses, Dr. Lawrence Kolbe and Dr. Ronald Miller respectively, testify at trial regarding the alleged profitability of the OPIS transaction.

### A. Respondent's Expert Witness

Dr. Kolbe subjected petitioner's OPIS transaction to net present value (NPV) and expected rate of return analyses. The NPV of an investment is the initial value of an investment calculated, in part, by determining its immediate and future cashflows. The purported purpose of an NPV analysis, as submitted by Dr. Kolbe, is to measure the "instantaneous change" in an investor's wealth resulting from a decision to make a particular investment. Dr. Kolbe asserted that sound investments have NPVs that are at least zero and ideally are positive. An expected rate of return analysis compares the "expected" rate of return on an investment with its "cost of

capital". Dr. Kolbe defined "cost of capital" as the market-determined required rate of return for a given level of risk. Respondent proffers that if an expected rate of return on a proposed investment is lower than its cost of capital, there are better investments available that do not require having to bear more risk.

Dr. Kolbe performed a comprehensive analysis of petitioner's OPIS transaction examining both the transaction, as a whole, and its discrete elements. As an initial finding, Dr. Kolbe concluded that the options that Deutsche Bank received from Cormorant on May 27, 1999, pursuant to the share option transaction, had a value[8] of EUR 3,219,938 more than the value of the options that Cormorant received from Deutsche Bank. In accordance with his finding, Dr. Kolbe concluded that the share option transaction was materially mispriced to the detriment of both Cormorant and petitioner and surmised that the transaction conveyed material fees to Deutsche Bank.

Dr. Kolbe also calculated the values of the payments contemplated in the swap agreement: (1) the floating rate payment that Clara LLC was required to pay

---

[8]Dr. Kolbe calculated the values of the various options "using standard option pricing approaches". These approaches endeavored to assign a value to the options consistent with "the average price you would expect to observe if the options were publically traded, or if you obtained a series of bids for these options from investment banks without telling the bank in advance whether you wished to buy or sell the option."

petitioner; and (2) the fixed rate payment petitioner was to pay to Clara LLC under the prepayment option. Dr. Kolbe concluded that the floating rate payment was worth EUR 1,924,122 less than the fixed rate payments as of May 27, 1999, and, accordingly, that the swap agreement was also materially mispriced to the disadvantage of petitioner. Dr. Kolbe also calculated the pretax NPV of the swap agreement as negative $2,012,439 and determined that the expected rate of return was materially negative relative to its cost of capital.

The value of the GP call option that petitioner purchased from Clara LLC on May 27, 1999, for $150,000 was, as calculated by Dr. Kolbe, actually worth only $31,701. The pretax NPV of the GP call option to petitioner was calculated as negative $118,299. Dr. Kolbe also determined that petitioner paid EUR 145,644 more for the 919,931 OTC call options from Deutsche Bank than they were worth on July 6, 1999. The pretax NPV of the OTC call options was computed as negative $158,912. Dr. Kolbe again concluded that the GP call option, as well as the OTC call options, was materially mispriced to petitioner's disadvantage and the expected rates of return on both were materially negative relative to their cost of capital.

Including petitioner's purchase of the 45,834 shares of Deutsche Bank stock, Dr. Kolbe determined that, before fees, the NPV to petitioner of the entire OPIS

transaction was negative $2,288,738. After fees, the NPV to petitioner was negative $2,905,686. The expected rate of return for the OPIS transaction, including or excluding the purchase of Deutsche Bank shares, was determined to be materially negative relative to the cost of capital.

B. Petitioner's Expert Witness

Dr. Miller analyzed the total risk and return profile of petitioner's OPIS transaction using a "Monte Carlo simulation method". He described this method as follows:

> In such a simulation approach, a computer randomly generates a large number of possible future price paths for Deutsche Bank stock. These paths are based on random numbers picked by the computer. The simulated potential future paths are generated to mimic the actual historic behavior of the stock price in terms of mean and variance of returns. Each of these simulated price paths represents one possible path that the stock price could have taken over a period of the OPIS strategy. * * * For each of these possible paths, the simulation program computes the returns on each component of the OPIS strategy. Using these simulated returns, it is possible to analyze the probabilities of different returns to the OPIS strategy and this evaluate its economic substance.

Dr. Miller noted that the simulation embodied a model that Deutsche Bank stock would "continue to earn its long-run average rate of return with its long-run average volatility". After performing the simulation, Dr. Miller found that approximately 25% of the time the overall strategy would be expected to produce a profit, net of

fees, before any tax benefits. Under a more conservative approach (using GARCH model volatilities), the simulation revealed that approximately 23% of the time, petitioner's OPIS transaction would be expected to produce a profit, net of fees, before any tax benefits. Nonetheless, if one were "bullish" on Deutsche Bank stock, expecting the price of the stock to significantly rise, Dr. Miller concluded that the OPIS transaction would look more attractive; however, Dr. Miller also expressed that "[O]n average, and at the median, the transaction generates a substantial loss."

## OPINION

The case before us concerns the tax implications of petitioner's OPIS transaction. As reported by petitioner, the transaction shifted $49,821,912.41 of basis from Cormorant's Deutsche Bank stock to petitioner's Deutsche Bank shares and options. Petitioner asserts that the basis shift is in accord with the tax laws; in particular, section 302(a) and section 1.302-2(c), Example (2), Income Tax Regs.[9] We briefly summarize petitioner's reasoning.

---

[9]Sec. 1.302-2(c), Income Tax Regs., provides, in relevant part:

In any case in which an amount received in redemption of stock is treated as a distribution of a dividend, proper adjustment of the basis of the remaining stock will be made with respect to the stock redeemed. * * * The following examples illustrate the application

(continued...)

(1)   Cormorant's sale of its 828,104 shares of Deutsche Bank stock according to the share option agreement, and the sale of its remaining 91,827 shares to Deutsche Bank effected a redemption of stock under section 317(b).

(2)   In determining whether a distribution in redemption of stock is treated as a sale of stock under section 302(a) or a distribution of property under section 301, the attribution rules of section 318 generally apply.  See sec. 302(c).  These rules attributed to petitioner the shares of Deutsche Bank stock that petitioner owned directly or through options.  See sec. 318(a)(4).  Also under the attribution rules, petitioner was treated as owning 50% of Clara Ltd. pursuant to the terms of the GP call option.  See id.  Clara Ltd., in turn, was treated as owning all of the stock owned directly or indirectly by petitioner.  See sec. 318(a)(3)(C), (4).[10]

---

[9](...continued)
of this rule:

\*      \*      \*      \*      \*      \*      \*

Example (2).  H and W, husband and wife, each own half of the stock of Corporation X.  All of the stock was purchased by H for $100,000 cash.  In 1950 H gave one-half of the stock to W, the stock transferred having a value in excess of $50,000.  In 1955 all of the stock of H is redeemed for $150,000, and it is determined that the distribution to H in redemption of his shares constitutes the distribution of a dividend.  Immediately after the transaction, W holds the remaining stock of Corporation X with a basis of $100,000.

[10]Sec. 318(a)(3)(C) provides:  "If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such corporation

(continued...)

Furthermore, as Clara Ltd. was essentially wholly owned by Clara LLC, the attribution rules treated Clara Ltd. as owning nearly 100% of Cormorant (approximately 1% directly and 99% through application of section 318(a)(3)(C)). Accordingly, all the Deutsche Bank shares deemed owned by Clara Ltd. were treated as owned by Cormorant. See sec. 318(a)(3)(C), (4). In sum, Cormorant was deemed to own all the shares petitioner owned or was deemed to own.

(3) Petitioner asserts that, pursuant to the attribution rules noted supra, Deutsche Bank's redemption of Cormorant's shares did not completely terminate Cormorant's interest in the corporation, see sec. 302(b)(3), nor qualify as a substantially disproportionate redemption under section 302(b)(2). Instead, petitioner concludes that the redemption was a distribution of property governed by section 301. See sec. 302(a), (d). As Deutsche Bank's earnings and profits were sufficient to ensure that the distribution would have no effect on Cormorant's stock's basis, petitioner treated the entire distribution as a dividend. See secs. 301(c), 316.

(4) Following the redemption, Cormorant retained its tax basis in the Deutsche Bank stock but owned no shares directly. Petitioner shifted Cormorant's

---

[10](...continued)
shall be considered as owning the stock owned, directly or indirectly, by or for such person."

residual basis to his Deutsche Bank shares and options in accord with section

1.302-2(c) and Example (2), Income Tax Regs. The strategy purportedly

increased petitioner's basis in his Deutsche Bank stock and options by roughly $50

million. Petitioner's sale following this basis shift resulted in a substantial capital

loss.

Respondent rejects petitioner's tax treatment of the OPIS transaction and

asserts several arguments in support of his position that petitioner is not entitled to

claim the capital loss deduction at issue: (1) Cormorant never owned the Deutsche

Bank stock as it never acquired the benefits and burdens of ownership with respect

to the stock; accordingly, respondent submits that petitioner could not "shift"

Cormorant's nonexistent stock basis to his own; (2) if Cormorant did own the

Deutsche Bank stock for Federal income tax purposes, the redemption should be

viewed in context of the entire OPIS transaction, resulting in the distribution's being

treated as a sale or exchange of stock, see sec. 302(b)(3); (3) petitioner's OPIS

transaction lacked economic substance; (4) even if the OPIS transaction functioned

for tax purposes in the manner petitioner intended, the claimed losses are artificial

and not deductible under section 165; and (5) any allowable loss is limited by the at-risk rules of section 465.[11]

We hold that petitioner's OPIS transaction lacked economic substance. Accordingly, our discussion focuses solely on the parties' contentions concerning the tax treatment of the entire investment. The remaining arguments by respondent need not be addressed herein.[12]

_____

[11]Respondent also argued that sec. 269 prevented petitioner from deducting losses in connection with the transaction; however, in his posttrial reply brief respondent represented that he is "no longer pursuing this argument".

[12]We do note that respondent's arguments concerning whether Cormorant ever received the benefits and burdens of stock ownership or, alternatively, whether Cormorant's redemption of Deutsche Bank stock was a distribution in sale or exchange of stock under sec. 302(a) and (b)(3), both would warrant more exacting consideration under different circumstances.

Many of the factors this Court uses in evaluating whether a transaction has transferred the "accoutrements" of stock ownership appear to reveal that Cormorant's "ownership" of the Deutsche Bank stock was illusory. See Anschutz Co. v. Commissioner, 135 T.C. 78, 99 (2010) (citing 11 factors evaluated in determining whether a transaction validly transfers stock ownership), aff'd, 664 F.3d 313 (10th Cir. 2011); Calloway v. Commissioner, 135 T.C. 26, 33-34 (2010) (citing 8 factors). Furthermore, it appears uncontested that Cormorant's redemption of the Deutsche Bank stock followed by the sale of petitioner's stock was part of an orchestrated plan to create a large capital loss for petitioner. See Merrill Lynch & Co. v. Commissioner, 120 T.C. 12, 51-52 (2003) (finding that this Court will integrate a redemption with one or more other transactions to decide whether the requirements of sec. 302(b) are met if the redemption was part of a "firm and fixed plan" as evidenced by the taxpayer's intent), aff'd in part and remanded in part, 386 F.3d 464 (2d Cir. 2004). While we merely note the apparent merit of these

(continued...)

I.  Burden of Proof

In general, the burden of proof with regard to factual matters rests with the taxpayer.  Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue.  Because we decide this case on the basis of the preponderance of the evidence, we need not decide upon which party the burden rests.

II.  Economic Substance

A.  Overview of the Parties' Arguments

Respondent generally asserts that petitioner engaged in the OPIS transaction, an investment respondent alleges offered no reasonable opportunity for profit, with the sole understanding that the transaction would result in a substantial and beneficial tax loss.  Respondent submits that petitioner's efforts to minimize his tax liabilities immediately preceding the OPIS transaction, including a contemplated move to Nevada and numerous meetings with a KPMG representative to discuss

---

[12](...continued)
assertions on which we do not arrive at any definitive conclusions, we do not intend to cast any negative inference on respondent's other arguments.

various tax strategies, belie his position that its profit potential was a significant determinant which influenced him to invest in it. Petitioner's indifference to the economics of the OPIS transaction and his lack of due diligence before entering into it, respondent argues, are further evidence that it was merely a tax-motivated investment vehicle.

Petitioner counters that the OPIS transaction afforded him an opportunity to profit aside from its attendant tax benefits. Petitioner submits that his business purpose for entering into the OPIS transaction reflects a profit motive and that only a mispricing of the options, which petitioner asserts was not apparent at the inception of the transaction, prevented the transaction's profit potential from coming to fruition. Notwithstanding the mispricing of the options, petitioner also proffers that had the OPIS transaction been entered into a few months later, he would have made several million dollars on the transaction as a whole.

B. The Economic Substance Doctrine

The economic substance doctrine is a judicial mechanism which allows a court to disregard a transaction for Federal income tax purposes if it finds that the taxpayer did not enter into the transaction for a valid business purpose but rather sought to claim tax benefits not contemplated by a reasonable application of the language and purpose of the Code or the regulations. See, e.g., Horn v.

Commissioner, 968 F.2d 1229, 1236 (D.C. Cir. 1992), rev'g Fox v. Commissioner,

T.C. Memo. 1988-570; see also CMA Consol., Inc. v. Commissioner, T.C. Memo.

2005-16 ("Numerous courts have held that a transaction that is entered into

primarily to reduce tax and which otherwise has minimal or no supporting economic

or commercial objective, has no effect for Federal tax purposes.").

In Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978), the

Supreme Court explained the circumstances in which a transaction should be

respected for tax purposes, articulating, in effect, the basis of the modern economic

substance doctrine:

> where, * * * there is a genuine multiple-party transaction with
> economic substance which is compelled or encouraged by business or
> regulatory realities, is imbued with tax-independent considerations, and
> is not shaped solely by tax-avoidance features that have meaningless
> labels attached, the Government should honor the allocation of rights
> and duties effectuated by the parties. * * *

Most courts have interpreted the cited passage as creating a two-pronged inquiry:

(1) whether the transaction had economic substance beyond tax benefits (objective

prong); and (2) whether the taxpayer has shown a nontax business purpose for

entering the disputed transaction (subjective prong). See, e.g., ACM P'ship v.

Commissioner, 157 F.3d 231, 247-248 (3d Cir. 1998), aff'g in part, rev'g in part

T.C. Memo. 1997-115; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820

F.2d 1543, 1549 (9th Cir. 1987), aff'g T.C. Memo. 1986-23; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91-92 (4th Cir. 1985), aff'g in part, rev'g in part 81 T.C. 184 (1983).

Nonetheless, the Courts of Appeals are split as to the proper application of the economic substance doctrine, particularly as to the appropriate relationship between the objective and subjective prongs in determining whether a transaction should be respected for tax purposes. See Blum v. Commissioner, T.C. Memo. 2012-16; Feldman v. Commissioner, T.C. Memo. 2011-297.

An appeal in this case would lie to the U.S. Court of Appeals for the Ninth Circuit absent a stipulation to the contrary and, accordingly, we follow the law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Courts of Appeals for the Ninth Circuit has rejected the notion of a "rigid two-step analysis" and elects, instead, to apply an approach under which the subjective and objective prongs are elements of a single inquiry. See Sacks v. Commissioner, 69 F.3d 982, 988 (9th Cir. 1995), rev'g T.C. Memo. 1992-596. The court considers the subjective and objective prongs merely "precise factors" to consider in an overall inquiry as to whether the transaction had "any practical economic effects" other than tax benefits. Id.

A.  Objective Inquiry

In general, a transaction has economic substance and will be respected for Federal tax purposes where the transaction offers a reasonable opportunity for profit independent of tax savings.  Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). The Court of Appeals for the Ninth Circuit has observed that this inquiry requires an analysis of whether the "transaction had any economic substance other than creation of tax benefits."  Sacks v. Commissioner, 69 F.3d at 987 (emphasis added) . Economic substance depends on whether, from an objective standpoint, the transaction was likely to produce benefits aside from tax deductions.  See Kirchman v. Commissioner, 863 F.2d 1486, 1492 (11th Cir. 1989), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d at 1549; see also Levy v. Commissioner, 91 T.C. 838, 859 (1988) (a pretax profit in excess of actual investment is indicative that the investment is supported by economic substance).  In evaluating whether petitioner's OPIS transaction had economic substance, we consider the transaction in its entirety, rather than focusing only on each individual step.  See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 280 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001).

The parties rely primarily on the economic analyses of their respective experts in support of their positions concerning the OPIS transaction's profit potential. Respondent's expert, Dr. Kolbe, submitted a report evaluating the OPIS transaction's NPV and expected rate of return relative to the transaction's cost of capital. Dr. Kolbe concluded that the NPV of the transaction, taking into account fees, was negative $2,905,686. Further, according to Dr. Kolbe's analysis, the expected rate of return on the transaction was materially negative compared to its cost of capital. Respondent proffers that these valuations evidence that "[p]etitioner's OPIS transaction, as a whole, offered materially lower expected returns than could be achieved in other investments while bearing no risk."

Petitioner correctly asserts that the expected rate of return analysis performed by Dr. Kolbe is "functionally equivalent" to the NPV analysis. Both of the tests endeavor to compare the economics of the OPIS transaction with other similar instruments, as determined by respondent's expert. This Court has recently indicated, while analyzing the economic substance of a separate OPIS transaction, that neither of respondent's tests addresses the fundamental question of whether a transaction had profit potential. See Blum v. Commissioner, T.C. Memo. 2012-

16.[13]  We also find respondent's analyses do little to aid in our determination of whether a profit was "reasonably likely" in the OPIS transaction.  See Andantech L.L.C. v. Commissioner, T.C. Memo. 2002-97 (citing Estate of Thomas v. Commissioner, 84 T.C. 412, 440 n.52 (1985)), aff'd in part, remanded in part, 331 F.3d 972 (D.C. Cir. 2003).  Accordingly, we ascribe little value to respondent's NPV and expected rate of return analyses in our present inquiry.

Nonetheless, Dr. Kolbe's additional comparison of the "values" of the discrete elements of the OPIS transaction to their purchase price does, partially, illuminate the economics of petitioner's investment.  Dr. Kolbe concluded that petitioner overpaid $2,289,650 for the entire OPIS transaction.  This amount included overpayments of:  (1) $2,012,439 to Clara LLC for the swap agreement; (2) $118,299 to Clara LLC for the GP call option; and (3) $158,912 to Deutsche Bank for the OTC call options.  With the exception of the Deutsche Bank stock, Dr. Kolbe found that each distinct aspect of the transaction was materially mispriced to

[13]See also Gefen v. Commissioner, 87 T.C. 1471, 1499 (1980), where in deciding whether a partnership was engaged in an activity for profit within the meaning of sec. 183, we noted:  "'[T]he availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit.'  Sec. 1.183-2(b)(9), Income Tax Regs.  It is not for us to second-guess investment decisions by taxpayers."

the disadvantage of petitioner.  Such findings are not always indicative of the true nature of an investment.  See  Blum v. Commissioner, T.C. Memo. 2012-16 ("A bad deal or a mispriced asset need not tarnish a legitimate deal's economic substance.").  Nonetheless, "grossly mispriced assets or negative cashflow can * * * contribute to the overall picture of an economic sham."  Id. (citing Country Pine Fin., L.L.C. v. Commissioner, T.C. Memo. 2009-251).  Accordingly, the significant mispricing of the OPIS transaction, while not a dispositive factor in our present inquiry, certainly signals to this Court that the transaction was devoid of economic substance.

Petitioner's expert, Dr. Miller, used a "Monte Carlo simulation method" (Monte Carlo analysis) to analyze the OPIS transaction and concluded that under approximately 25% of the possible future price paths for the Deutsche Bank stock, the investment would be expected to produce a "pretax profit".  Under a more conservative approach, petitioner contends the transaction could be expected to produce a "pretax profit" approximately 23% of the time.  Respondent's expert rejected petitioner's expert's analysis, assigning error to his use of the "historical volatility" of Deutsche Bank stock in his calculations rather than its "implied

volatility". Dr. Kolbe testified that if the proper volatility were used, the profit probability would be "more in the 10 to 12% range than in the 23 to 25% range."[14]

Without opining on the more effective approach advocated by the parties in performing a Monte Carlo analysis, we find it clear that the "pretax profit" potential of the transaction was so remote as to render disingenuous any suggestion that the transaction was economically viable. When we further consider the allegedly purposeful mispricing of the instruments which made up the OPIS transaction, it is clear that petitioner remained in an economically untenable position with little hope of profit before taking into account the investment's tax benefits. We are unconvinced that the mere hint of future profitability, be it at a 10 or 25% likelihood, especially in the light of the underlying circumstances of the transaction,[15] requires this Court to conclude that the investment was "likely" to

---

[14]The parties have not established what a "pretax profit" entails. Petitioner's expert report appears to embrace the notion that a "pretax profit" includes any positive return, be it de minimis or substantial. Dr. Miller refers us only to positive returns in the 95th and 99th percentiles, which reveal profits of approximately EUR 3 million and EUR 6 million, respectively. No indication is given of the returns in the 74th through 94th percentiles. Respondent's expert does little to clarify this important point. Nonetheless, we can presume that the likelihood of profitability might be somewhat less if de minimis returns are disregarded in the analyses.

[15]The Court of Appeals for the Tenth Circuit, in particular, has held that the mere presence of potential profit does not automatically impute substance where a

(continued...)

produce benefits aside from substantial capital losses.  See Bail Bonds by Marvin
Nelson, Inc., 820 F.2d at 1549.

Petitioner also submits a series of hypothetical situations where the OPIS
transaction would have been profitable.  In particular, petitioner contends that had
the transaction been entered into a few months later, he would have made several
million dollars on the transaction as a whole.  We find such hypothetical situations
to be of marginal relevance given the reality of the investment's returns and
petitioner's own expert's conclusions.  It is undeniable that petitioner suffered a
significant economic loss of approximately $342,507 on his OPIS transaction.  A
depiction of the investment's true economic returns, assuming petitioner properly
allocated KPMG's fees, follows:

---

[15](...continued)
commonsense examination of the transaction and the record in toto reflect a lack of
economic substance.  Sala v. United States, 613 F.3d 1249, 1254 (10th Cir. 2010);
Keeler v. Commissioner, 243 F.3d 1212, 1219 (10th Cir. 2001), aff'g Leema
Enters., Inc. v. Commissioner, T.C. Memo. 1999-18; see also Blum v.
Commissioner, T.C. Memo. 2012-16.

|  | Purchase price | KPMG fee | Sale price | Approximate gain or (loss) |
|---|---|---|---|---|
| Deutsche Bank stock | $2,491,848.65 | $234,767.39 | $2,947,974.39 | $221,359 |
| OTC call options | 615,439.50 | 57,983.11 | 833,433.00 | 160,011 |
| SWAP with Clara LLC | 3,350,000.00 | 315,617.38 | 3,007,815.00 | (657,802) |
| GP call option | 150,000.00 | 14,132.12 | 98,057.00 | (66,075) |
| Total |  |  |  | (342,507) |

Petitioner asks that we discard these figures and engage in conjecture and supposition concerning possible outcomes of the transaction under completely different circumstances. Engaging in such inquiries would only divert our attention from the true economic reality of the transaction. The uncontested facts reveal that a pretax profit on the investment was highly unlikely; in fact, the transactional design effectively assured that petitioner's investment would result in a significant loss. Petitioner's own expert concurred with this analysis, admitting that "on average, and at the median, the transaction generates a substantial loss." Notwithstanding petitioner's contentions to the contrary, we find that the evidence reveals the OPIS transaction to be clearly lacking in economic substance.

B.  Subjective Inquiry

The subjective inquiry of the economic substance doctrine focuses on whether the taxpayer has shown a business purpose for engaging in a transaction other than tax avoidance.  Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d at 1549.  This, in essence, requires an examination as to whether the taxpayer was induced to commit capital for reasons relating only to tax considerations or whether a nontax or legitimate profit motive was involved.  Shriver v. Commissioner, 899 F.2d 724, 726 (8th Cir. 1990), aff'g T.C. Memo. 1987-627; see also Andantech L.L.C. v. Commissioner, T.C. Memo. 2002-97.

Petitioner testified that he believed there was an opportunity to profit from the OPIS transaction, aside from its attendant tax benefits, on his assumption that the Deutsche Bank stock would substantially appreciate.  In fact, if not for a material mispricing of the options, petitioner asserts that the transaction would have been exceptionally profitable.  Moreover, petitioner submits that he "could not have reasonably known that the options were mispriced to his detriment" and notes that it took respondent's expert, Dr. Kolbe, "hundreds of hours" and a "sophisticated pricing model" to discover the pricing error.

Respondent generally contends that petitioner engaged in the OPIS transaction solely for tax avoidance purposes.  Respondent relies on the significant

efforts of petitioner to reduce his tax liabilities which prefaced the investment as evidencing his true motives for engaging in the transaction. Respondent also notes that petitioner failed to fully investigate the alleged profitability of the transaction and, instead, relied solely on the representations of KPMG partner and "salesman", Carl Hasting. Petitioner also failed to heed the advice of his own adviser and former KPMG audit partner, Mr. Carnahan, to hire competent counsel capable of analyzing the very technical aspects of the transaction. Respondent further submits that petitioner's failure to price the OPIS transaction on the open market, even after Mr. Carnahan confirmed that there were similar products being sold by other national firms, indicates that petitioner's proffered profit motive is specious and should be rejected by this Court.

We agree with respondent's characterization of petitioner's motive. It is apparent that petitioner was engaged in a course of action with the principal and overriding purpose of reducing or eliminating tax on a significant capital gain. Petitioner maintained a business relationship with Mr. Hasting in an effort to remain apprised of new tax strategies. The OPIS transaction was one of these strategies and only became an appealing option for petitioner when it became apparent that the investment would eliminate petitioner's gain from the sale of his DiTech assets. Petitioner, on brief, even admits that he had a "substantial tax motivation" for

participating in the OPIS transaction. We recognize that transactions are often purposefully structured to produce favorable tax consequences and that such planning, alone, does not compel the disallowance of the transaction's tax effects. See Frank Lyon Co. v. United States, 435 U.S. at 580; see also ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 513 (D.C. Cir. 2000) ("It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax."), aff'g T.C. Memo. 1998-305; Ewing v. Commissioner, 91 T.C. 396, 420 (1988) ("we are cognizant of the fact that tax planning is an economic reality in the business world and the effect of tax laws on a transaction is routinely considered"), aff'd without published opinion, 940 F.2d 1534 (9th Cir. 1991). Nonetheless, taxpayers must demonstrate to the Court that the transaction was effected for a business purpose aside from these tax benefits. See Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288 (citing Horn v. Commissioner, 968 F.2d at 1237). Petitioner has failed to convince this Court that he participated in the OPIS transaction for any purpose other than to avoid income tax. Although petitioner testified that he believed he would profit from the transaction, the economic reality of investment, discussed supra, and his conduct belie his asserted profit motive.

Petitioner knew little to nothing about the details of the OPIS transaction. The extent of his knowledge was limited to an understanding that the OPIS transaction was a "formula or a recipe" that would provide him with a substantial capital loss. Despite the fact that petitioner and his closest advisers were ignorant as to the function and design of the investment, petitioner never investigated the transaction further, relying instead on the opinion letters provided by or on behalf of KPMG. Petitioner's lack of due diligence in researching the OPIS transaction indicates that he knew he was purchasing a tax loss rather than entering into a legitimate investment. See Pasternak v. Commissioner, 990 F.2d 893, 901 (6th Cir. 1993), aff'g Donahue v. Commissioner, T.C. Memo. 1991-181; Blum v. Commissioner, T.C. Memo. 2012-16; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.

We find unconvincing both petitioner's insistence that his reliance on KPMG was reasonable and his assertion that, in any event, he could not be expected to discover that the OPIS transaction was materially mispriced to his disadvantage. In essence, petitioner asks this Court to excuse his willful indifference as to the profit potential of the transaction and to accept that his uninformed position was sufficient to satisfy our business purpose inquiry. Petitioner is a sophisticated businessman and had ample opportunity to fully investigate the transaction, by either comparing

the price of the transaction on the open market or hiring outside counsel to analyze the transaction. Petitioner's refusal to engage in these prudent business techniques and his reliance on representations made by a recognized KPMG "salesman" only underscore that petitioner was entirely unconcerned with the profitability of the investment. The OPIS transaction served petitioner's desire for a tax avoidance vehicle, and we find dubious petitioner's contentions otherwise.

II. Conclusion

While we are not obligated to use a formal two-pronged economic substance inquiry in our analysis of the OPIS transaction, see Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), aff'g T.C. Memo. 1987-628, after consideration of these factors we hold that the transaction was devoid of economic substance and, accordingly, should be disregarded for tax purposes.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.